841 So.2d 749 (2003)
PARISH NATIONAL BANK
v.
Norman D. OTT, III, M.D. and Beverly C. Ott.
No. 2002-C-1562.
Supreme Court of Louisiana.
February 25, 2003.
Rehearing Denied May 2, 2003.
*750 Roy Edward Blossman, John Anthony Dunlap, New Orleans, Carver, Darden, Koretzky, Tessier & Finn, for Applicant.
Charlton DeWitt Hunley, Mark S. Stein, New Orleans, Lowe, Stein, Hoffman Allweiss & Hauver, for Respondent.
David Joseph Boneno, Metairie, for Louisiana Bankers Association (Amicus Curiae).
TRAYLOR, J.
Parish National Bank ("PNB") seeks review of the decisions of the lower courts, finding Norman D. Ott, III, M.D. ("Dr. Ott") not liable to PNB on a master note executed by Dr. Ott and his wife, Beverly Gallavan ("Ms.Gallavan"), and dismissing PNB's action. In addition, the trial court dismissed Dr. Ott's reconventional demand against PNB for damage to his credit and, because there were no damages rendered against Dr. Ott, the trial court dismissed his cross-claim against Ms. Gallavan. The court of appeal, in a 2-1 decision, affirmed the trial court judgment. After reviewing the record and the applicable law, the judgments of the lower courts are reversed in part as to Dr. Ott's liability and affirmed in all other aspects.

FACTS AND PROCEDURAL HISTORY
On May 27, 1994, Dr. Ott and his wife, now Ms. Gallavan, signed a promissory note in favor of PNB, which allowed Dr. Ott and Ms. Gallavan to borrow up to $100,000 for a real estate business, which was run out of their home.[1] After the $1,000 initial draw required to open the line of credit account, any future draw requests required signatures of both Dr. Ott and Ms. Gallavan.
Between June 6, 1994 and August 24, 1994,[2] five draw requests totaling $98,000 were submitted by facsimile[3] to PNB and were purportedly signed by both Dr. Ott and Ms. Gallavan. The draws, by direction of the draw requests, were wired to a Hibernia National Bank account in the name of Beverly Ott d/b/a Contracting Resources, Inc. The line of credit was periodically paid down. However, on January 9, 1995, and January 18, 1995, two additional draw requests, purportedly signed by both Dr. Ott and Ms. Gallavan, were submitted to PNB, one for $40,000 and one for *751 $18,000.[4]
Dr. Ott testified he did not sign any of the draw requests, never authorized Ms. Gallavan to sign his name to the draw requests and was unaware the line of credit was being accessed by Ms. Gallavan until August or September of 1994 and as late as October of 1994. Dr. Ott testified while at the home office he came across an interest statement indicating the line of credit had been accessed. He further testified that he merely told Ms. Gallavan, "Don't sign my name again." Evidencing his knowledge of the draw requests, on November 29, 1994, Dr. Ott surreptitiously recorded a telephone conversation between he and Ms. Gallavan, wherein Ms. Gallavan admitted to making the draw requests by signing his name; however, she never conceded she was not authorized to do so. In December of 1994, Dr. Ott executed a duplicate original of the loan documents and submitted the original life insurance policy as collateral per PNB's second request. He testified he signed the documents because "[f]rom the inception, as a matter of course, I, of course, made that right, since it was my original intention to contract the loan." Further, the facts indicate Dr. Ott finally called PNB in late January, 1995 instructing PNB not to authorize any more draw requests without his verbal authorization; however, he never mentioned any unauthorized activity on the account.[5] In fact, Dr. Ott's testimony revealed he never mentioned anything to PNB regarding unauthorized draw requests until some time after he personally made an interest payment on the line of credit on April 27, 1995.
Upon maturity of the loan in May of 1995, Dr. Ott finally advised PNB of the forgeries and refused to pay the debt. The line of credit went into default and PNB reported the delinquency to credit reporting agencies.
On April 22, 1996, PNB filed a petition against Dr. Ott and Ms. Gallavan, alleging they were solidarily liable for the total principal amount of $100,000 plus interest, costs and attorneys' fees. On May 31, 1996, a default judgment was entered against Ms. Gallavan in the amount of $99,105.00 plus interest and attorneys' fees. PNB based its claims against Dr. Ott on theories of ratification or confirmation of the debt, estoppel and breach of a duty to supervise Ms. Gallavan, the comaker of the loan, and failure to timely notify PNB of any unauthorized activities.
After a trial on the merits, the trial court held the controlling factor in the action was PNB's failure to exercise commercially reasonable banking standards. The trial court concluded that PNB's actions and its lack of sound banking procedures created the situation and Dr. Ott's actions were not the controlling factor in the outcome. The trial court also found Dr. Ott's actions did not ratify Ms. Gallavan's unauthorized activities and that Dr. Ott's actions with respect to notifying PNB were reasonable under the circumstances.
On April 17, 2002, the court of appeal, in a 2-1 decision, affirmed the trial court's judgment. However, in a dissent, Judge Byrnes concluded the trial court's finding that Dr. Ott's conduct was reasonable under the circumstances is manifestly erroneous.
*752 On appeal to this court, Dr. Ott for the first time raises an exception of prescription, contending PNB's causes of action are prescribed. PNB opposed the exception. This court finds Dr. Ott's argument regarding prescription to be without merit.
For the reasons set forth below, we reverse the trial court's judgment in part, finding that Dr. Ott is liable for the draw requests made in January 1995, after he knew that unauthorized draw requests had been made on the account and had an opportunity to prevent any future unauthorized draw requests. In all other respects, the trial court judgment is affirmed.

LAW AND DISCUSSION
Exception of Prescription
On appeal to this court, Dr. Ott for the first time raises an exception of prescription, contending PNB's claims had prescribed. According to La.Code Civ. P. art. 2163,[6] an appellate court may consider the peremptory exception filed for the first time in that court, if pleaded prior to a submission of the case for a decision, and if proof of the ground of the exception appears of record. Further, plaintiff may demand the case be remanded to the trial court for trial of the exception.[7]See La. Code Civ. P. art. 2163.
In considering the exception of prescription, this court notes Dr. Ott argues PNB's causes of action, based on his alleged failure to notify PNB of the forged signatures and on the theory of agency by estoppel, are prescribed. Dr. Ott argues any such claim related to a "duty" to disclose arises ex delicto, which has a liberative prescription of one year. Dr. Ott asserts that PNB had one year from the date of the last unauthorized draw request, which was January 18, 1995, to file suit. Thus, Dr. Ott concludes that since PNB did not file suit until April 1996, its petition is prescribed on its face. In opposition, PNB contends the nature of its action arises ex contractu in that Dr. Ott's duty to disclose arose from the terms of the loan itself and from the obligation to perform contracts in good faith, which is imposed by law. Under this theory of liability, PNB asserts a liberative prescription of five years is applicable according to La. Civ.Code art. 3498.[8] It further asserts the applicable five year prescriptive period commenced to run when the loan matured on May 26, 1995.
Regarding prescription under the facts of this case, La. Civ.Code. art. 3498 provides in pertinent part that "[a]ctions on instruments, whether negotiable or not, and on promissory notes, whether negotiable or not, are subject to a liberative prescription of five years." This case arises from a promissory note executed by Dr. Ott and Ms. Gallavan in May 1994, which PNB alleged was past due, delinquent and in default. The "causes of action" alleged *753 to have prescribed by Dr. Ott are not causes of action, rather they are arguments made in response to Dr. Ott's defense of forgery and unauthorized draw requests. In sum, considering the note was executed in May 1994 and suit for collection was filed in April 1996, the note had not prescribed.
Based on the applicable law and facts, this court finds this matter clearly arises under contractual obligations regarding the promissory note executed by Dr. Ott and Ms. Gallavan. Therefore, Dr. Ott's exception of prescription is denied.
On the Merits
This court does not take issue with the trial court's findings regarding Dr. Ott's knowledge or alleged authorization of Ms. Gallavan's signing of his name to draw requests made between June 6, 1994 and August 24, 1994, or whether Dr. Ott's actions ratified or confirmed the obligations undertaken in the draw requests between the above dates. Dr. Ott testified that he did not give Ms. Gallavan permission to sign his name and that he knew nothing of the draw requests until as late as October 1994. On the other hand, Ms. Gallavan testified that Dr. Ott played a substantial role in the real estate business and he knew that she would access the line of credit by signing his name to the draw requests to purchase or renovate property in their business. She further testified that he never objected to her signing his name because he was usually at work and not available to sign. In this case, the trial court weighed the credibility of both parties and gave more weight to Dr. Ott's testimony, finding Dr. Ott did not know the line of credit was accessed between June and August of 1994 and did not authorize or ratify Ms. Gallavan's actions.
In addition, the court does not take issue with the trial court's factual finding that Dr. Ott's conduct, under the circumstances, did not ratify or confirm Ms. Gallavan's actions regarding the line of credit during the period between June and August of 1994. Nor does this court take issue with the trial court's factual finding that PNB did not exercise commercially reasonable banking standards as applied to the facts of this case. These are factual issues which this court will defer to the findings of the trial court. Where there is conflicting testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court is convinced that had it been the trier of fact, it would have weighed the evidence differently. Lirette v. State Farm Ins. Co., 563 So.2d 850 (La.1990). The trier of fact is in a better position to evaluate the credibility of witnesses and make factual determinations than is a reviewing court. Stobart v. State Through DOTD, 617 So.2d 880 (La. 1993). We cannot say the trial court's credibility calls and factual determinations were clearly wrong. The trial court determined that the actions of Dr. Ott were not the controlling factors in this case, but rather the controlling factor was PNB's failure to exercise reasonable banking standards. In Stobart, we stated:
A court of appeal may not set aside a trial court's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." This court has announced a two-part test for the reversal of the factfinder's determinations: (1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and (2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous). The issue to be resolved by the reviewing court is not whether the trier of fact is right or *754 wrong but whether the factfinder's conclusion was a reasonable one.... The reviewing court must always keep in mind that if the trial court's findings are reasonable in light of the record reviewed its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as trier of fact, it would have weighed the evidence differently.
We do, however, take issue with the trial court's finding that Dr. Ott's actions after November 1994, when there was no doubt he knew Ms. Gallavan had forged his name on previous draw requests and failed to inform PNB of the unauthorized draw requests at that time, were reasonable.
Although there are no special rules applicable to unauthorized draw requests such as those found in the Louisiana version of the UCC regarding negotiable instruments and bank deposits and collections,[9] there are specific rules governing the promissory note signed by Dr. Ott, which is a negotiable instrument governed by Title 10, La. R.S. 10:1-203, which provides "[e]very contract or duty within this Title imposes an obligation of good faith in its performance or enforcement." Additionally, it provides that "the standard of good faith performance required under this Title shall be based on Civil Code Articles 1983, 1996 and 1997." La. Civ. Code art. 1983 provides that "contracts must be performed in good faith." La. Civ.Code art.1996 provides that "an obligor in good faith is liable only for the damages that were foreseeable at the time the contract was made." Finally, La. Civ. Code art. 1997 provides that "[a]n obligor in bad faith is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform."
The record clearly reveals Dr. Ott discovered the forgeries as early as August 1994, and as late as October 1994, when he found an interest statement on the desk in the home office. He testified:
Q. When was the first time you learned of the fact that Beverly Ott accessed that line of credit in addition to the original one thousand dollar draw that you made individually?
A. I can't pin it down to an exact date, but it had to be sometime in late August or September, I think, of '94. Could have some leeway, but, that seems to be about right.
* * *
Q. How did you come to find out that she had accessed the line of credit?
A. Well, I was in the office and there was some sort of interest sheet or somethingor something of that nature from Parish National Bank there, and I saw that and it struck me that Ithat I hadn'tthat Ithat I hadn't signed any draws and I don't know the time span in which I talked to her about it, but I asked her about it and [s]he told me that she had signed my name on that line of credit.
Q. And what time frame are we speaking of? When approximately did that happen?
A. August, September, October, '94. *755 Further, the record is clear Dr. Ott knew Ms. Gallavan was purchasing and renovating property, some of which he had a personal interest in and others in the name of CRI, in which he was a thirty percent shareholder. Later, his testimony revealed he was concerned enough regarding Ms. Gallavan's dealings with the line of credit that he tried to take precautions in his real estate dealings:
Q. The money that came from Parish National Bank, are you aware that it was deposited into a Hibernia account?
A. I really don't know where it was deposited.
Q. You don't know where it went? Did you know that Beverly had drawn the money on the Parish National Bank loan?
A. Well, not `til I had found the interest payments, sometime [in] September or October, in '94.
Q. Okay. Now, you were aware that she was purchasing properties in the name of Contracting Resources, Inc.?
A. That she was purchasing properties? Yes.
Q. You didn't know whose name the properties were going in?
A. I know there were some in her name and my name, individually. Through the whole time span, some were in Contracting Resources solely, and two properties, Contracting Resources and Terrence Tyler, and then I think the last two were Contracting Resources and Norman Ott.
Q. Was there any reason why you acquired an interest in the last two, in joint ownership with Contracting Resources, Inc.?
A. Yes.
Q. And what would that be.?
A. Well, by this time I knew that the loan was not as it should have been, the draws, and I felt that I could dothat I could control the funds and protect myself, but Mr. Motter was at the closing of these two things and failed to put the funds into escrow, so those fund[s] were lost.
Thereafter, in November 1994, he surreptitiously recorded Ms. Gallavan stating she did in fact sign his name to draw requests. Thus, as noted by Judge Byrnes in dissent, by Dr. Ott's own testimony, he admitted that while he became aware of the problem on the line of credit account when he came across the interest statement in September or early October, he waited until late November 1994 to even question Ms. Gallavan about the matter and made no mention of it whatsoever to PNB. Dr. Ott admitted it was not until March or April at the earliest that he finally notified his accountant that his signatures on the draw requests were forged. Dr. Ott's actions were egregious and unreasonable in that he waited a few months after discovering the forgeries before even taking minimal action and it was not for several months after that when he finally told PNB that his signatures had been forged on the draw requests. The record establishes that had he notified PNB of the unauthorized activity on the account as early as November 1994, when he knew for certain that Ms. Gallavan was signing his name to the draw requests, PNB could have taken precautions to protect both of their interests. However, the facts reveal that Ms. Gallavan proceeded to make two additional draw requests in January 1995. The finding of the trial court that Dr. Ott's actions in failing to inform PNB at some point after November 1994 and prior to Ms. Gallavan's draw requests in January 1995 were reasonable under the circumstances is clearly erroneous in light of the record in its entirety. This court believes that the obligation of good faith and fair dealing *756 imposed by La. R.S. 10:1-203 applies to the issues presented by this appeal. This court believes this obligation applied to the actions, or lack of action, of Dr. Ott in failing to notify PNB of the forgeries.

DECREE
The judgments of the lower courts are reversed in part, as Dr. Ott is liable for the draw requests made in January 1995, after he was well aware of the previous unauthorized draw requests and failed to inform PNB. The matter is remanded to the trial court for entry of judgment in accordance with this opinion. In other respects, the trial court judgment is affirmed.
NOTES
[1] The facts indicate Dr. Ott and Ms. Gallavan represented the line of credit was for a real estate business, Contracting Resources, Inc. ("CRI"), of which Dr. Ott owned thirty percent of the shares and Ms. Gallavan and her daughter owned the remaining shares and primarily handled the business. CRI purchased, renovated and re-sold houses. Initially, Ms. Gallavan attempted to secure the line of credit in the name of CRI; however, because of insufficient financial data on the company, a separate application was submitted for a line of credit based on Dr. Ott's and Ms. Gallavan's credit; thus, the line of credit was ultimately issued in the names of Dr. Ott and Ms. Gallavan, individually.
[2] Notably, between May 1994 and August 1994, CRI purchased numerous properties, including 1221 Hudson Street in Kenner, Louisiana; Rt. 1, Box 510 in Yscloskey, Louisiana; and 5225 Rye Street in New Orleans, Louisiana. These purchases were made jointly with Dr. Ott. In fact, the Yscloskey property Dr. Ott now owns by donation from CRI for consideration of $20,000 paid by Dr. Ott.
[3] Testimony by a PNB representative revealed that draw requests by facsimile were not customary, however, PNB allowed the draw requests to be submitted by facsimile to comply with Dr. Ott's and Ms. Gallavan's request.
[4] During that time, CRI purchased several more properties, namely, 7037 Magazine Street in New Orleans, Louisiana; 208 Carrollton Street in Metairie, Louisiana; and 320 Waldo Street in Metairie, Louisiana.
[5] Facts further revealed Dr. Ott and Ms. Gallavan physically separated in early January 1995. Thereafter, however, several properties were purchased by Dr. Ott jointly with CRI.
[6] La.Code Civ. P. art. 2163 provides:

The appellate court may consider the peremptory exception filed for the first time in that court, if pleaded prior to a submission of the case for a decision, and if proof of the ground of the exception appears of record.
If the ground for the peremptory exception pleaded in the appellate court is prescription, the plaintiff may demand that the case be remanded to the trial court for trial of the exception.
[7] In the instant case, PNB has not made any demands that the case be remanded to the trial court for trial of the exception of prescription and argues the exception should be denied.
[8] La. Civ.Code art. 3498 provides:

Actions on instruments, whether negotiable or not, and on promissory notes, whether negotiable or not, are subject to a liberative prescription of five years. This prescription commences to run from the day payment is exigible.
[9] The written draw requests in this matter are not "instruments" as defined under Louisiana's version of the UCC, La. R.S. 10:3-104(b), and thus not governed by the Negotiable Instrument provisions of UCC Chapter 3. Further, the draw requests are not "items" and accordingly not governed by the Bank Deposit and Collections provisions of UCC Chapter 4. Specifically, the rules and standards of conduct for banks and depositors are not directly applicable, such as the time limit for when a deposit account owner must notify the drawer bank of an unauthorized check. La. R.S. 10:4-406.