848 So.2d 765 (2003)
KAPPA LOYAL, L.L.C.
v.
PLAISANCE DRAGLINE & DREDGING COMPANY, INC.
No. 03-CA-124.
Court of Appeal of Louisiana, Fifth Circuit.
June 19, 2003.
Rehearing Denied July 16, 2003.
*766 Edward T. Diaz, Golden Meadow, LA, for Appellant.
Samuel A. Giberga, Joseph C. Peiffer, New Orleans, LA, and Robert L. Raymond, Destrehan, LA, for Appellee.
Panel composed of Judges EDWARD A. DUFRESNE, JR., JAMES L. CANNELLA and MARION F. EDWARDS.
MARION F. EDWARDS, Judge.
Defendant/appellant Plaisance Dragline & Dredging Company Inc., (Plaisance) appeals a judgment granting eviction after finding that it breached its lease with plaintiff/appellant Kappa Loyal L.L.C. (Kappa). We affirm.
In May of 1993, the Louisiana Land and Exploration Company (LL & E) and Plaisance entered into a "Crawfish Farm, Grazing and Wildlife Management Area Lease." The lease in question involves property along a levee in St. Charles Parish known as the Paradis Reclamation Project, and consisted of 1,714.66 acres surrounded by a fresh water marsh, and at its eastern extreme, a navigable waterway known as the Paradis Canal. The lease was for the initial period of ten years, with an option to renew. In October 2001, LL & E sold its property to Kappa and transferred its rights under the lease pursuant to an "Assignment and Assumption of Lease." On November 5, 2001, Kappa sent a letter to Plaisance alleging certain "Maintenance Violations" and on November 21, 2001, a letter was sent notifying Plaisance that the lease rights were terminated. On December 7, 2001, Kappa filed a rule to Evict Tenant and for Possession of Premises against Plaisance. Following trial on the merits, on June 5th the court rendered judgment finding that "... the main thrust of plaintiff's argument, and the area of maintenance with which this court is concerned, deals with the issue of the clearing and recapping of the perimeter levees." The court quoted Article 9 of the lease and found that the language was unclear and ambiguous. Thus, the court looked beyond the four corners of the lease to ascertain the intent of the parties.
It was held that Plaisance had an obligation under the lease to recap 32,150 feet of the perimeter levee as indicated in the correspondence and because only 6,400 feet had been recapped, the court found Plaisance to be in breach of the lease.
The court did not find that immediate eviction was the appropriate remedy, and because LL & E had never made demand for performance of maintenance nor notified Plaisance of any default, and LL & E had no problems with the operation of the property, the court determined not to order eviction without first giving Plaisance *767 the opportunity to complete the recapping. The rule to evict was denied, and Plaisance was ordered to recap an additional 6,900 feet of the perimeter levees on the west and north side prior to April 30, 2003, with work to commence within 30 days of the date of judgment. Expert witness fees of $500.00 were assessed against Plaisance, as were all costs of court.
Kappa filed a Motion for New Trial, urging that the exclusive remedy of the court in a rule for eviction is, in fact, eviction, and that the specific performance of maintenance was not allowed in this proceeding. The motion was granted for the limited purpose of clarifying the judgment. Both parties agreed that the court was not authorized to order specific performance. On July 30, 2002, the court rendered a second judgment, determining that it intended to give Plaisance an opportunity to cure the breach of lease: The court then amended its earlier judgment by ordering eviction, but allowing Plaisance the opportunity to cure its breach of lease by commencing its maintenance obligations as per the guidelines and timetable established on June 5th. In the event it chose not to do so, Plaisance was ordered to vacate the property no later than August 2, 2002. It is this judgment that Plaisance appeals.
On appeal, Plaisance urges that the trial court erred in considering evidence of the "environmental theory of breach of contract," because that claim had been abandoned. Plaisance also argues that the court erred in relying on evidence outside the four corners of the lease, in order to determine the lessee's obligation thereunder. Additionally, Plaisance urges the court erred in finding that the parties intended that it would have the obligation of recapping the levees, and that it breached its obligations under the lease.
Plaisance asserts that the entire thrust of the Notice to Vacate and the Rule to Evict was based upon a claim that Plaisance violated environmental standards, and that there was no mention of a "recapping theory" in the original proceedings.
Although Plaisance does not favor us with any statutory or jurisprudential references in its brief to this court, we note La. C.C.P. art. 4731(A):
If the lessee or occupant fails to comply with the notice to vacate required under this Title, or if the lessee has waived his right to notice to vacate by written waiver contained in the lease, and has lost his right of occupancy for any reason, the lessor or owner, or agent thereof, may cause the lessee or occupant to be cited summarily by a court of competent jurisdiction to show cause why he should not be ordered to deliver possession of the premises to the lessor or owner. The rule to show cause shall state the grounds upon which eviction is sought.

The pleading filed by Kappa stated only that the lease was terminated. However, attached to and incorporated in the rule was a copy of the lease, its assignment from LL & E to Kappa, and correspondence sent to Plaisance by Kappa. The letter, dated November 21, 2001 and sent by Kappa's attorney, stated in pertinent part:
Our client wrote to you on November 5, 2001 concerning your failure to properly adhere to the maintenance requirements under the lease. All of these maintenance requirements are specifically provided for by the lease, and, in certain situations, by applicable law. The letter further stated that unless you agreed to the immediate and proper performance of these maintenance requirements that Kappa Loyal would have to terminate the lease. Your letter of response dated November 12 is not acceptable, *768 and your position and actions do not satisfy your obligations as tenants under the lease. Accordingly, in accordance with Section 15 of the lease, Kappa Loyal, as lessor, hereby terminates the lease effective November 30, 2001.
Here, Kappa demanded eviction for Plaisance's failure to properly maintain the property, which, as the attached lease illustrates, included the levees.
Article 9 of the lease states as follows:
Lessee takes cognizance that the property hereby leased is located in a reclamation area, surrounded by levees, and that drainage of the area is maintained by leveeing and pumping, using an existing pumping station, levees and a series of drainage canals, ditches and reservoirs. Lessee acknowledges that it has inspected the levees, drainage canals, roads, ditches reservoirs and pumping station and is familiar with the condition of each, and particularly, that it is familiar with the condition of the levees, machinery and equipment of the pumping station. In connection therewith, Lessee binds and obligates itself as follows:
(a) Lessee agrees to maintain, repair and operate, at its sole cost and expense, the existing pumping station, its pumps, machinery and equipment, and to replace, at its sole cost and expense, any and all machinery, pumps and equipment, or part thereof, which from time to time must be replaced in order to properly operate the pumping station, its pumps, machinery, pumps and equipment (or parts thereof) presently existing on the leased premises. All such replacement machinery, pumps and equipment (and parts thereof) shall become and remain the property of the Lessor, without payment of any consideration thereof, and may not be removed by Lessee at the termination of this lease.
(b) Lessee agrees to maintain, at its sole cost and expense, the drainage canals, roads, ditches, ponds, reservoirs and levees including perimeter levees, in such condition as is necessary to assure proper and adequate passage over and protection and drainage to the leased premises, and take all reasonable steps necessary to prevent the overflow of any of the perimeter levees; it is understood and agreed, however, that Lessee shall have the right to dredge the existing borrow canal, located outside the perimeter of the leased premises and indicated on Exhibit "B" as "borrow canal", for the purpose of obtaining spoil to maintain and raise the said perimeter levees.
Thus the court correctly considered evidence relative to recapping as maintenance. Further, although Kappa avers that the letter of November 5, 2001 was attached to the rule, the record does not so evidence, and there is no reference to the letter as an exhibit in the rule. That letter was admitted at trial, however, and states partially as follows:
Section 9 of the Lease contains specific maintenance requirements that the Lessee agrees to undertake in light of the fact that the Leased Premises consist of a reclamation area surrounded by levees which requires constant drainage and infrastructure maintenance. In addition, Section 14 of the Lease requires you to comply with all laws, rules and regulations of any federal, state or local agency having jurisdiction over the Leased Premises and your operations under the Lease.
This is to formally advise you, as Lessee, that you have not properly performed your obligations as Lessee with *769 respect to you maintenance requirements and unless immediate, complete and satisfactory maintenance repairs are made that Kappa Loyal will terminate the lease pursuant to Section 15.
The letter then referred to an environmental audit and specified a number of maintenance items to be addressed immediately, including:
The levees require significant work which is essential in order to maintain the integrity of the Leased Premises as a reclamation area. The new levees that were constructed after Tropical Storm Alison must be planted to protect from erosion. All levees must be cleaned, cut and mowed. In addition, there must be diligent inspection of the levees and repair of any animal or other damage. The breach that was partially repaired requires recapping and planting.
At trial, Plaisance objected to admission of the audit attached to the correspondence, but not to the letter itself. The letter illustrates that recapping was a principal element of the maintenance issue, of which element Plaisance was made aware prior to Kappa's notification to vacate the property. Finally, there was testimony during trial regarding recapping. Because Plaisance did not urge that admission of such evidence concerning the failure to recap was beyond the scope of the pleadings, evidence on this matter was thus properly admitted.[1]
The law on contract interpretation has been summed up as follows:
We are obligated to give legal effect to contracts according to the true intent of the parties. LSA-C.C. art.2045. The true intent of the parties to a contract is to be determined by the words of the contract when they are clear, explicit, and lead to no absurd consequences. LSA-C.C. art.2046. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. LSA-C.C. art.2046. In such cases, the meaning and intent of the parties to the written contract must be sought within the four corners of the instrument and cannot be explained or contradicted by parol evidence. LSA-C.C. art. 1848. Contracts, subject to interpretation from the instrument's four corners without the necessity of extrinsic evidence, are to be interpreted as a matter of law, and the use of extrinsic evidence is proper only where a contract is ambiguous after an examination of the four corners of the agreement. In cases in which the contract is ambiguous, the agreement shall be construed according to the intent of the parties. Intent is an issue of fact which is to be inferred from all of the surrounding circumstances. A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and other contracts of a like nature between the same parties. LSA-C.C. art.2053. Whether a contract is ambiguous or not is a question of law. Where factual findings are pertinent to the interpretation of a contract, those factual findings are not to be disturbed unless manifest error is shown.[2]
*770 In its Reasons for Judgment, the court considered the issue of ambiguity:
Kappa Loyal contends that Article 9 of the lease requires Plaisance to recap the perimeter levee. Plaisance's position regarding this issue is not clear. At one point in the trial Glenn Plaisance testified that he believed that the recapping of the levee was to be performed over the 20 years of the lease. Later he testified that he did not believe that Plaisance had an obligation to recap the levee and that any recapping that was performed was over and above the requirements of the lease. Although Article 9 of the lease requires Plaisance to maintain the levees in such condition as is necessary to assure protection and drainage to the leased premises, and to take all reasonable steps necessary to prevent the overflow of any of the perimeter levees, the parties did not delineate in the lease any specific acts that Plaisance was required to undertake in order to fulfill this obligation of maintenance. At best, the language of Article 9 is unclear and ambiguous as to the specific acts that Plaisance was required to undertake in order to maintain the perimeter levees.
Our review of the lease discloses that the general requirement in Article 9 to take reasonable steps to maintain the levees does not describe or define specific actions to be taken by Plaisance in assuring protection and drainage to the premises, and in preventing overflow. As Kappa points out, maintenance could involve recapping of all or only some of the levees, or could encompass some other requirements. In that respect, we agree that the lease is vague and uncertain, and the trial court properly admitted parol evidence to clarify the ambiguity and reveal the intent of the parties.
In this case, discerning the intent of the parties to the lease necessarily involves determining the intent of LL & E, as well as that of Plaisance, as of the time the lease was confected.
Glen Plaisance testified that his company is a general oil field contractor. As he began negotiating for the original lease, Kermit Coulon of LL & E wrote to him with information and maps of the area, and stated, in a letter dated February 19,1993: "As you are aware any proposal should include recapping of the outer levee in the early stages of the lease.... We are interested in a long term lease and a Lessee that will make a commitment to the maintenance of the Project." Plaisance responded in a letter dated March 8, 1993 by stating, in part:
We will commit all necessary equipment and labor to repair approximately 13,300 feet of levee located on the west and north side of the project. We would suggest the broadening of this levee base to 20 feet and the crown by 10 feet and recap an additional 18,850 feet of levee located on the north, east, and south exteriors of the project.... We would maintain approximately 5,000 feet of access road and elevate with limestone where necessary, repair the two 24' discharge pipes, construct shelter over pump station, and repair decking.
On April 5, 1993, LL & E sent a letter to Plaisance, stating that "[we] wish to inform you that we have accepted your proposal regarding said lease." No evidence of any other proposal by Plaisance was admitted at trial.
At trial, Plaisance testified that the repair of the 13,300 feet of levee was "in a long term, twenty year deal":
We're looking at twenty years having the lease and there was approximately thirteen hundred and so many feet that we would do over that period of time. *771 There was [sic] some of the areas in this first letter that said needed to be recapped at the beginning of the lease. This was the area that I was talking about.
Plaisance stated that he didn't understand that he was supposed to recap all of the outer levees, but only a portion of them. He based his offer to recap the additional 18,850 feet of levee on noticing different spots that possibly could give them problems in the future. Because the levee was approximately 34,700 feet long, Plaisance understood that there were only three or four thousand feet of levee that were not going to be recapped. He testified that he has recapped 6400 feet, and cleared approximately 10,600 feet of exterior levee to facilitate recapping for maintenance in the southwest and south areas of the project. The only other recapping that has been done occurred in places on the levee that were breached. Such breach occurred in 1998 with Tropical Storm Fran and again in 2001 with Tropical Storm Alison. There was approximately six and one-half miles of perimeter levee.
Plaisance testified that the obligations imposed in article 9(b) of the lease were not the same as he outlined in his proposal to LL & E. He knew there were areas that needed recapping, which would be done at the start of the lease, and possibly in the future "in the long time. So, what I'm reading in the actual lease is telling me that I have to maintain it, maintain the levees in a passable[sic]. That's where it differs from what we were sending in our letters for our bid proposal." It was never indicated to him that he had to recap the entire levee, although Plaisance figured that eventually, that would have to be done. Plaisance testified:
... what my proposal that I offered to LL & E was just a proposal. It was not, when we negotiated, when we went in to talk about the lease none of my proposal was in the lease. I recapped six thousand, four hundred feet. It was because I wanted to. It wasn't because I had to do it. I cleared out the ten thousand, six hundred feet of exterior levee. I didn't have to do that. The lease didn't tell me to do that.
He subsequently added: "what the lease tells me to do or dictates for me to do is not what's in the proposal." Plaisance felt that he did not have to do any additional recapping unless the levees were breached.
Kermit Coulon testified that the acceptance of Plaisance's offer was based not only on the matters in the proposal, but also on LL & E's past dealings with the Plaisance as a tenant, and the history of the property itself. Plaisance's family has pleased from LL & E for the last fifty years in Lafourche Parish and they have been good tenants. At the time the original lease was awarded, another lessor had bid the lease for $127,000.00 per year, in addition to arranging to recap the weakened sections of the levee. When the lease was awarded to Plaisance, it was taken into consideration that Plaisance had another project nearby, with machinery, and LL & E could call them on short notice in case of any problems. Making money was not as important as maintaining business relationships and having good tenants. Coulon testified that Plaisance was accepted as the lessee based on his written proposal as well as for the other factors mentioned above.
The property in Paradis had flooded in 1991, and the breaches in the levees were repaired at that time. The pump discharge pipes were also in poor condition. After Plaisance leased the land, LL & E employees would go there from time to time to hunt alligators, but did not go for the purpose of inspecting it. Every year, *772 LL & E would fly over all its properties to check all 600,000 acres, but the property could not be checked, from the air, for rodent holes, density of brush or trees, or flooding on the property from an eroding levee. LL & E did not have reports of any deficiencies in maintenance on the Paradis project. However, after Tropical Storm Alison, an LL & E employee was sent to inspect the area, and found three or four places where the water had come over the levees. Because Plaisance was busy repairing another portion of levee, and because there was a pending sale to Kappa, LL & E decided to have a contractor repair those breaches and recap the levees; Coulon did not consider this to be an obligation of Plaisance under the lease. However, on cross-examination he stated that normally, this repair would have been Plaisance's duty. During LL & E's ownership, there were no problems with Plaisance's maintenance of the levees.
In its Reasons for Judgment, after reviewing the lease on the question of maintenance and recapping of levees, the court stated:
The most compelling evidence regarding the intent of the parties regarding maintenance of the perimeter levees comes from the correspondence of the parties prior to the execution of the lease. In a January 28, 1993 letter from LL & E to Glenn Plaisance, Kermit Coulon, Jr. indicated that "the levee system will require additional recapping in order to ensure its stability in the event of high water or storms." In a subsequent letter on February 9, 1993, in which LL & E sought a proposal from Plaisance for the lease of the Property, Mr. Coulon indicated that "any proposal should include recapping of the outer levee in the early stages of the lease." And in his proposal dated March 8, 1993, Glenn Plaisance would "commit all necessary equipment and labor to repair approximately 13,300 feet of levee located on the west and north side of the project" and "recap an additional 18,850 feet of levee located on the north, east, and south exteriors of the project." In his letter of Arpil 5, 1993, to Glenn Plaisance, Mr. Coulon indicated that after reviewing all of the proposals submitted that LL & E had accepted Plaisance's proposal regarding said lease. (Judgment With Reasons)
The court found that during the first year, Plaisance did in fact recap approximately 6,400 feet of the perimeter levee. Finally, the court determined that the annual rental of $8,000.00 for 1,631 acres of land appeared to be extremely low unless the parties intended that there would be some other substantial form of consideration such as the recapping of levees at the lessee's expense. Based on these findings, the court found that Plaisance had an obligation under the maintenance provisions of Article 9 to recap 32,150 feet of the perimeter levee as indicated in its March 8, 1993 proposal.
In applying the manifest error rule to the trial court's interpretation, the Court of Appeal may not simply substitute its own view of the evidence for the trial court's view, nor may it disturb the trial court's finding of fact so long as it is reasonable.[3] The court's conclusion that the annual rental was extremely low unless the parties intended some other substantial form of consideration such as recapping was a reasonable one. The court determined, and we agree, that Plaisance's testimony was unclear relative to his belief and intent at the time the lease was fashioned. *773 When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings, for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said.[4]
Mr. Coulon testified that Plaisance's bid was accepted based on its proposal, as well as on experience with the Plaisance family on other properties. We find that the written instruments, that is, the lease bid requiring all proposals include recapping in the early stages of the lease, the proposal submitted by Plaisance incorporating recapping, and LL & E's acceptance of that proposal, support the conclusion of the trial court that Plaisance had an obligation to recap the levees. We hold that the trial judge's factual finding as to intent was reasonable and adequately supported by credible evidence in the record and we find no manifest error in either that determination, or in the finding that the lease was breached.
Plaisance urges that any uncertainty in a lease agreement must be construed against the lessor, in favor of the lessee, and against dissolution, in favor of maintenance of the lease. However, under La. C.C. art.2053 a doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties. Testimony of both Coulon and Plaisance indicated that these were sophisticated parties who had formed other like contracts. Although LL & E had not made demand for additional recapping, Coulon's testimony revealed that inspection of the property during the term of the lease was minimal and the levees were not inspected.
While it spent large sums on maintenance, Plaisance admitted that early on, it recapped only 6,400 feet of levee. In addition, it later recapped small portions of the levee after water topped over in those areas. After notification by Kappa following its assumption of the lease, Plaisance did not respond by recapping the perimeter levees. The evidence supports the conclusion of the trial court that the maintenance terms of the lease were breached, and therefore eviction was a proper remedy. La. C.C.P. art. 4701.
For the foregoing reasons, the judgment is affirmed. Plaisance is taxed all costs of appeal.
AFFIRMED.
NOTES
[1] See La. C.C.P. art. 1154; Lacrouts v. Future Abrasives, Inc., 99-583 (La.App. 5 Cir. 11/10/99), 750 So.2d 1063; writ denied XXXX-XXXX (La.2/11/00), 754 So.2d 941.
[2] Fleniken v. Entergy Corp., XXXX-XXXX (La. App. 1 Cir. 2/16/01), 790 So.2d 64, writ denied 01-1268 (La.6/15/01), 793 So.2d 1250, writ denied 01-1305 (La.6/15/01), 793 So.2d 1253, writ denied 01-1317 (La.6/15/01), 793 So.2d 1254.
[3] Syrie v. Schilhab, 96-1027 (La.5/20/97), 693 So.2d 1173; Lakeland Anesthesia, Inc. v. CIGNA Healthcare of LA, Inc., XXXX-XXXX (La. App. 4 Cir.2/6/02), 812 So.2d 695.
[4] D & D Investments v. First Bank and Trust, 02-440 (La.App. 5 Cir. 10/29/02), 831 So.2d 488.