FREDERICKA HOMBERG WICKER, Judge.
 

 12Defendant Westbank Body Works, Inc. (“Westbank”) appeals a trial court judgment in favor of plaintiff Spectrum Automotive Finishes, Inc. (“Spectrum”). Following a bench trial, the trial court awarded Spectrum $7,070.96 for a debt owed by Westbank on a contract the trial judge characterized as a consignment contract, $637.19 for a debt owed to Spectrum by Westbank on an account the trial judge characterized as an open account. The judgment additionally awarded Spectrum twenty five percent attorney’s fees on the balance of the alleged open account. Westbank asks us to determine that the alleged consignment was in fact a sale for which no money was due and that Westbank is owed a credit on attorney’s fees due on the open account.
 
 [1]
 
 For the reasons that follow, we affirm.
 

 Spectrum is a distributor of PPG Industries automotive paint. Westbank is an automotive repair business and body shop. This suit involves a disagreement over automotive paint and finishing products that Spectrum provided to Westbank pursuant to various agreements between 2000 and 2006. On October 17, 2007, |sSpectrum filed a Petition In Suit for Open Account and Breach of Contract (the “Petition”). In the Petition, Spectrum contended that it provided equipment to Westbank at no charge and initially stocked paint and accessories “via a consignment method.” In the Petition, Spectrum additionally contended that Westbank owed it $7,070.96 on the “consignment contract” and $637.16 on an “open account.” Westbank filed an Answer on December 17, 2007 contending that any and all amounts that it may have owed Spectrum had been paid in full.
 

 At the bench trial, Spectrum first called on cross-examination Dana Kern, West-bank’s owner. Mr. Kern testified that in 2000 he became displeased with some of the paint products his then current distributor was providing to him. Mr. Kern decided to investigate the feasibility of switching to PPG Industries automotive
 
 *878
 
 paint. According to Mr. Kern, after conversations with Spectrum, Westbank entered into an “agreement” with in 2000. Mr. Kern testified that he understood that Spectrum would provide Westbank with paint mixing equipment and an initial supply of PPG Industries paint pursuant to the agreement. Mr. Kern further testified that he understood that Westbank would be thereafter be “charged for the paint” as it was used in the course of Westbank’s business. Mr. Kern testified that Tracy Lasang, a Spectrum saleswoman, told him that Spectrum would not charge Westbank for the initial supply of paint. According to Mr. Kern, Ms. Lasang told him that the initial supply of paint was an incentive to win Westbank’s business. Mr. Kern testified that Westbank and Spectrum representatives executed a PPG/Distributor/User Conditional Use Contract (the “Contract”).
 
 [2]
 
 Spectrum employees thereafter installed a paint mixing system at Westbank’s place of business. According to Mr. Kern, the mixing system included an initial supply of paint.
 

 |4Mr. Kern testified that he cancelled the Contract in 2006. After Mr. Kern can-celled the Contract, Spectrum employees picked up the paint mixing system that they had installed in 2000 as well as cans of automotive paint that had not been opened.
 

 Mr. Kern testified that after Westbank’s business relationship with Spectrum ended, he received two Spectrum invoices addressed to Westbank. The first invoice was dated December 1, 2006 (the “December 1 invoice”). The December 1 invoice indicated that Westbank owed Spectrum $7,431.72 for “mixing tonners [sic]” and that Spectrum owed Westbank $860.76 for “return on consgn [sic]” on account number 7321. Mr. Kern disputed that he owed Spectrum for the charges on the December 1 invoice. According to Mr. Kern, the charges on the December 1 invoice were not valid because they corresponded to the initial supply of paint which Spectrum provided to Westbank free of charge in 2000.
 

 Mr. Kern also acknowledged receiving a second invoice dated December 29, 2006 (the “December 29 invoice”) which indicated that Westbank owed Spectrum a “previous balance” of $637.16 on account number 7320.
 
 [3]
 
 After receiving the December 29 invoice, Mr. Kern drafted a letter to Spectrum. The letter reads in part “[e]nclosed is a check for $285.96. It is the balance on your statement dated 12/29 minus $360.76 credit which was sent us.” Mr. Kern testified to his belief that he was entitled to apply the $360.76 credit on the December 1 invoice to the charges on the December 29 invoice. Mr. Kern further testified that he sent a check in the amount of $285.96 to Spectrum. Counsel for Spectrum introduced the December 29 invoice into the record.
 

 Spectrum next called Kenny Boudreaux, the body shop manager at Don Bohn Ford. Mr. Boudreaux testified that the Don Bohn Ford body shop had | ^previously purchased PPG Industries paint from Spectrum. Seven months prior to trial, Mr. Boudreaux had terminated Don Bohn Ford’s relationship with Spectrum. Mr. Boudreaux testified that after the business relationship ended between Don Bohn Ford and Spectrum, Spectrum employees removed automotive paint and mixing equipment from the body shop. According to Mr. Boudreaux, Spectrum charged Don Bohn Ford for paint that had been opened.
 
 *879
 
 Mr. Boudreaux additionally testified that Don Bohn Ford received a credit from Spectrum for resalable paint that had not been opened. During cross-examination, Mr. Boudreaux admitted that he had no knowledge of the business relationship between Westbank and Spectrum.
 

 Spectrum’s final witness was Theodore Heine. Mr. Heine testified that he is the owner of Spectrum. According to Mr. Heine, Spectrum has been in the business of selling automotive parts, automotive paint, and body shop supplies for approximately forty-three years. Further, Mr. Heine testified that Spectrum has been selling PPG Industries automotive paint to mechanics, body shops, and automobile dealerships for thirty-two years. Mr. Heine testified that regular Spectrum customers, such as Westbank, usually pay for automotive paint and related products on open accounts. Spectrum customers generally sign invoices for paint products when they receive the products. The customers thereafter receive computer generated statements from which they pay outstanding bills.
 

 Mr. Heine recalled that in 2000 West-bank was using DuPont automotive paint. Mr. Heine testified that Spectrum installed a PPG Industries paint system “on consignment” after a demonstration. According to Mr. Heine, when Spectrum installs a paint system “on consignment,” it does not charge the customer for paint when it installs the system. Rather, Spectrum charges the customer for the paint Rafter the paint has been used and Spectrum has provided the customer with a new supply.
 

 When counsel for Spectrum asked Mr. Heine about the intent of the parties in entering into the Contract counsel for Westbank objected on the basis that Mr. Heine’s testimony would constitute parol evidence. After reviewing the Contract, the trial court allowed Mr. Heine to testify as to the intent of the parties. Mr. Heine testified that the Contract obligates Spectrum to install paint mixing equipment and to stock a new Spectrum customer with an initial supply of paint. Mr. Heine further testified that the Contract allows Spectrum to bill the customer for paint that is no longer resalable after the customer terminates its relationship with Spectrum. Mr. Heine noted that he had used the same Contract in the course of Spectrum’s business approximately 50 times.
 

 Mr. Heine indicated that when West-bank terminated its relationship with Spectrum, he went to Westbank with his employees and noted which paints were open or missing. According to Mr. Heine, he picked up all of the equipment that Spectrum had previously installed except for several cabinets. Mr. Heine additionally noted that nearly all of the cans of automotive paint and pearls had been used or were missing. Mr. Heine thereafter billed Westbank for the open or missing paints and pearls on the December 1 invoice and credited Westbank for paints and pearls that were resalable. He then sent the December 1 invoice to Westbank. According to Mr. Heine, the charges on the December 1 invoice corresponded to paints that were opened or missing and the credits on the invoice corresponded to paints that were resalable. Mr. Heine testified that the charges on the December 1 invoice corresponded to Westbank’s “consignment account.” Mr. Heine noted that Westbank had not paid for the charges on the December 1 invoice.
 

 |7Mr. Heine indicated that Westbank had an additional “regular account” with Spectrum. Mr. Heine testified that the “previous balance” charges on the December 29 invoice corresponded to the charges on the regular account. Mr. Heine recalled receiving the $285.96 check Mr. Kern had sent in payment of the Decern-
 
 *880
 
 ber 29 invoice. This check represented the amount due on the December 29 invoice less the credit on the December 1 invoice. Mr. Heine testified that he did not indorse or cash the check because it did not reflect the full payment listed on the December 29 invoice.
 
 [4]
 

 On cross-examination, Mr. Heine admitted that he was not present when the Contract was signed. Mr. Heine testified that Tracy Lasang was listed on the Contract as an “Authorized PPG Distributor.” Counsel for Westbank asked Mr. Heine on cross-examination if he knew about any conversation that Ms. Lasang of Spectrum had with Mr. Kern before Spectrum installed its equipment at Westbank. Mr. Heine admitted that Ms. Lasang and Mr. Kern met several times prior to the installation of the paint system. Mr. Heine additionally admitted that he was not present at every meeting Ms. Lasang had with Mr. Kern. However, Mr. Heine testified that he knew nothing about any benefit Ms. Lasang promised to Mr. Kern in exchange for Westbank executing the contract with Spectrum. Mr. Heine further admitted that the Contract does not explicitly permit Spectrum to charge Westbank for opened or missing merchandise.
 

 Spectrum introduced the March 1, 2000 Contract into the record.
 
 [5]
 
 Under the terms of the Contract, PPG Industries (through Spectrum) agreed to supply Westbank with several pieces of “Equipment listed on the reverse side” for $1.00. IsThis list is actually a second page attached to the Contract as a “PPG/Distributor Conditional Use Equipment Listing.” The Equipment Listing lists numerous items as “Equipment,” including automotive paint, which had been referred to on the first page of the exhibit as “Products.” The parties do not dispute that the second page of the exhibit is actually the reverse side of the Contract.
 

 Under the Contract, Spectrum agreed to supply Westbank with PPG Industries automotive paint “[f]or and in consideration of PPG Industries supplying [Westbank] with the [equipment].” Although the Contract obligated Westbank to resell the equipment to PPG Industries at the termination of the Contract, it did not specify how Westbank would pay for the initial purchase of automotive paint.
 

 On August 29, 2008, the trial court rendered its judgment for Spectrum and against Westbank without assigning reasons. In its judgment, the trial court found Westbank liable to Spectrum “in the amount of ... ($7,070.96) under the contract for consignment.” Although it is not explicitly stated in the judgment, it is apparent that the trial court determined that the charges on the December 1 invoice corresponded to the Contract. The difference between the amount Westbank owed Spectrum under the December 1 invoice ($7,431.72) and the amount Spectrum owed Westbank under the December 1 invoice, ($360.76) was $7,070.96. The trial court additionally indicated that Westbank was liable to Spectrum in the amount of $637.16 “for debt owed by Defendant to Plaintiff under open account.” Although it is not explicitly stated in the judgment, it is apparent that the trial court determined that the charges on the December 29 invoice corresponded to charges on an open
 
 *881
 
 account. The trial court additionally found Westbank liable for twenty five percent attorney’s fees on the $637.16 due on the December 29 invoice. Westbank filed this timely appeal.
 

 | ¡¡CONSIGNMENT CONTRACT AND DECEMBER 1 INVOICE
 

 Westbank specifies two assignments to the proceedings below. In its first specification of error, Westbank contends that the trial court erred in finding that it breached the Contract. In its brief, West-bank contends that the trial court erred by permitting Mr. Heine to testify as to his understanding of the Contract. Spectrum contends that the Contract is ambiguous with respect to “payment for paint or paint supplies” and that the trial court’s decision to allow Mr. Heine to testify was proper. In essence, Westbank contends that Spectrum did not intend to charge it for the initial supply of paint provided by Spectrum.
 

 While counsel for Westbank objected to the introduction of Mr. Heine’s testimony at trial, counsel failed to specify the trial court’s admission of Mr. Heine’s testimony as error.
 
 [6]
 
 Rather, Westbank assigned as error the trial court’s finding that it breached the Contract, not the trial court’s admission of Mr. Heine’s testimony. We review only issues which were submitted to the trial court and which are contained in specifications or assignments of error, unless the interest of justice clearly requires otherwise. Uniform Rules, Courts of Appeal, Rule 1-3;
 
 Roussell v. Roussell,
 
 96-148 (La.App. 5 Cir. 7/30/96) 678 So.2d 612, 615 (trial court’s refusal to address an issue is beyond the scope of appellate review when the appellant did not assign the trial court’s refusal to address the issue as error). Therefore, Westbank has waived its right to contest whether the trial court erred in permitting Mr. Heine to testify as to his understanding of the Contract.
 

 Even if Westbank had properly reserved the right to challenge the admission of Mr. Heine’s testimony on appeal, we find that the trial court did not err in admitting the testimony. Westbank is essentially arguing that the Contract is a contract of sale. According to Westbank, the trial court should have held that | ^Spectrum was required to sell it the equipment listed on the second page of the Contract, including the initial supply of automotive paint, for $1.00. Spectrum contends that the Contract is a consignment agreement and that it was entitled to bill Westbank for the portion of the initial supply of paint that Westbank used in the course of its business.
 

 The trial court agreed with Spectrum, and characterized the Contract as one of consignment. In a typical consignment agreement, the consignor retains title to goods and delivers them to the consignee for sale to the public.
 
 See, e.g., Harry Winston v. Levin,
 
 130 So.2d 717, 718-19 (La.App. 4th Cir.1961).
 
 Black’s Law Dictionary
 
 defines “consign” as “[t]o give (merchandise or the like) to another to sell, usu. [sic] with the understanding that the seller will pay the owner for the goods from the proceeds.” Black’s Law DictionaRY 303 (7th ed. 1999). Consignments are recognized in Louisiana.
 
 Harry Winston, Inc., supra; Winru Chemical & Sales Co. v. Collier,
 
 73 So.2d 9 (La.App. 2nd Cir.1954). By contrast, a “sale” is a contract whereby a person transfers ownership of a thing to another for a price in money. La. C.C. art. 2439. The thing, the price, and the consent of the parties are requirements for the perfection of a sale.
 
 Id.
 

 
 *882
 
 A contract is the law between the parties. La. C.C. art. 1983. Where the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties’ intent. La. C.C. art. 2046. Parol or extrinsic evidence is generally inadmissible to vary the terms of a written contract unless the written expression of the common intention of the parties is ambiguous.
 
 Campbell v. Melton,
 
 01-2578 (La.5/14/02), 817 So.2d 69, 75. Trial courts may consider parol evidence to explain the provisions of a written contract if the written expression of the common intention of the parties is ambiguous.
 
 Id.; Drachenberg v. Parish of Jefferson,
 
 563 So.2d 523, 525 (La.App. |„5 Cir.1990). A contract is considered ambiguous on the issue of intent when it lacks a provision bearing on that issue, the terms of a written contract are susceptible to more than one interpretation, there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language employed. La. C.C. art. 1848;
 
 Brown v. Drillers, Inc.,
 
 93-1019 (La.1/14/94), 630 So.2d 741, 748. Whether a contract is ambiguous or not is a question of law.
 
 Kappa Loyal, L.L.C. v. Plai-sance Dragline & Dredging Co., Inc.,
 
 OS-124 (La.App. 5 Cir. 6/19/03) 848 So.2d 765, 769.
 

 Where factual findings are pertinent to the interpretation of a contract, those factual findings are not to be disturbed unless manifest error is shown.
 
 Id.
 
 When the trier of fact’s determination is based on a decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.
 
 Rosell v. ESCO,
 
 549 So.2d 840, 845 (La.1989).
 

 One of the basic tenets of the manifest error standard of review is that “reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the court of appeal is convinced that had it been the trier of fact, it would have weighed the evidence differently.”
 
 Rando v. Anco Insulations Inc.,
 
 2008-1163 (La.5/22/09), 16 So.3d 1065 (citing
 
 Parish Nat. Bank v. Ott,
 
 02-1562 (La.2/25/03), 841 So.2d 749, 753). The Louisiana Supreme Court has announced a two-part test for the reversal of the factfinder’s determinations: (1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and (2) the appellate court must further determine that the record establishes that the finding is clearly wrong or manifestly erroneous.
 
 Ott,
 
 841 So.2d at 753. The issue to be resolved by the reviewing court is not whether the trier of fact is right or wrong but whether the factfinder’s conclusion was a reasonable one.
 
 Id.
 

 [12By its own terms, the Contract “[commenced] only with the initial purchase and resale of PPG Automotive Refinish Paint Products.” In addition, Westbank agreed to “resell [PPG products]” in exchange for the receipt of Spectrum’s paint mixing equipment. The Contract did not specify how Westbank would pay for the initial purchase of paint. Westbank argues that Spectrum intended to sell the paint to it for $1.00. Spectrum contends that the parties intended the Contract to be a consignment agreement and that it would bill Westbank for the used paint when West-bank discontinued the use of PPG Industries paint.
 

 The First Circuit encountered an analogous situation in
 
 Schroeter v. Holden,
 
 499 So.2d 309 (LaApp. 1 Cir.1986). The
 
 Schroeter
 
 defendant executed a purchase agreement to buy a house for $135,000.
 
 Schroeter,
 
 499 So.2d at 310. However, the purchase agreement did not specify under
 
 *883
 
 what terms the
 
 Schroeter
 
 defendant would purchase the house because the plaintiff had crossed out several clauses in the agreement.
 
 Id.
 
 The defendant attempted to introduce parol testimony regarding her need to obtain financing to purchase the property.
 
 Id.
 
 at 311. The plaintiff objected to the parol testimony, but the trial court determined that the contract was ambiguous on its face and overruled the objection. The trial court ruled that the plaintiff “was aware that the agreement to sell was contingent on [the defendant’s] being able to secure a loan,” and dissolved the purchase agreement.
 
 Id.
 
 The First Circuit affirmed, reasoning that there were “ambiguities as to how and in what form the agreed upon purchase price of $135,000 was to be paid. Therefore, the trial court properly allowed testimony on how the parties intended payment to be accomplished.”
 
 Id.
 
 at 312.
 

 In the instant case, the Contract obligated Westbank to purchase paint from Spectrum. However, the Contract did not indicate in what manner Westbank would pay for the initial supply of paint. The Contract does not indicate whether 113the initial supply of paint was to be supplied free of charge or whether Spectrum was entitled to charge Westbank for the initial supply of paint when Westbank cancelled the Contract. Nor does the first page of the Contract incorporate the attached second page containing the “Equipment” by reference. We therefore agree with the trial court that the terms of the Contract are ambiguous and that the trial court properly allowed parol testimony regarding how Spectrum and Westbank intended payment of the paint to be accomplished. Mr. Heine testified that Spectrum’s standard practice was to provide customers with an initial supply of paint. When Spectrum’s contract with a customer ended, Spectrum would charge the customer for paint that was opened or unusable. Mr. Boudreaux confirmed that Spectrum employees had collected equipment and charged Don Bohn Ford for paint that was unusable or opened when Don Bohn Ford’s business relationship ■with Spectrum ended. Mr. Kern testified to his belief that Spectrum was not charging Westbank for the initial paint supply in an effort to win back Westbank’s business. However, Mr. Kern admitted that he “bought” the initial paint supply and that “the agreement that we had ... I’d get a complete set-up and as I used that, as that was used then I would be charged for the paint.” The trial court could have credited the testimony of Mr. Heine and Mr. Boudreaux. Alternatively, the trial court could have credited the testimony of Mr. Kern indicating his belief that Spectrum was providing him with an initial supply of paint at no cost. The trial court decided to credit Mr. Heine’s and Mr. Boudreaux’s testimony rather than Mr. Kern’s testimony. Accordingly, we find that the trial court was not manifestly erroneous in determining that the Contract was a consignment agreement and that Westbank owed Spectrum $7,070.96 pursuant to the December 1 invoice.
 

 This assignment of error has no merit.
 

 J^OPEN ACCOUNT/DECEMBER 29 INVOICE
 

 In its second assignment of error, Westbank argues that the trial court erred in not applying the $285.76 check Mr. Kern mailed to Mr. Heine to the $637.16 balance due on the December 29 invoice. Westbank does not deny that an open account existed between the parties or that it owed Spectrum $637.16. Rather, West-bank contends that the trial court should have awarded a twenty five percent attorney’s fee on the difference between the $637.16 balance due on the December 29
 
 *884
 
 invoice and the $285.76 check Mr. Kern mailed to Mr. Heine.
 
 [7]
 

 La. R.S. 9:2781 provides, in pertinent part:
 

 A. When any person fails to pay an open account within thirty days after the claimant sends written demand therefor correctly setting forth the amount owed, that person shall be liable to the claimant for reasonable attorney fees for the prosecution and collection of such claim when judgment on the claim is rendered in favor of the claimant.
 

 * * ⅜
 

 C. If the demand is made by citation and service of a petition, the person shall be entitled to pay the account without attorney fees by delivering payment to the claimant or the claimant’s attorney within ten days after service of the petition in city courts and fifteen days after service of the petition in all other courts.
 

 D. For the purposes of this Section and Code of Civil Procedure Articles 1702 and 4916, “open account” includes any account for which a part or all of the balance is past due, whether or not the account reflects one or more transactions and whether or not at the time of contracting the parties expected future transactions.
 

 In order to prove that an open account exists, a creditor must first prove the account by showing that the record of the account was kept in the course of business and by introducing supporting testimony regarding its accuracy.
 
 Cline v. 11fiGeorge Kellett & Sons, Inc.,
 
 96-456 (La. App. 5 Cir. 11/14/96), 685 So.2d 206, 208. Once a prima facie case has been established by a plaintiff/creditor, the burden shifts to the debtor to prove the inaccuracy of the account or to prove that the debtor is entitled to certain credits.
 
 Id.
 
 An open account is analogous to credit account.
 
 Dixie Mach. Welding & Metal Works, Inc. v. Gulf States Marine Technical Bureau, Inc.,
 
 96-869 (La.App. 5 Cir. 8/12/97), 692 So.2d 1167. Factors to be considered in deciding whether an open account exists are: (1) whether there were other business transactions; (2) whether a line of credit was extended by one party to the other; (3) whether there are running or current dealings; (4) whether there are expectations of other dealings.
 
 Id.
 
 at 1170. The amount of an open account is a question of fact, which may not be disturbed absent manifest error.
 
 Cline,
 
 685 So.2d at 208.
 

 Mr. Heine testified that Westbank owed Spectrum $637.16 on the December 29 invoice. Mr. Kern acknowledged the receipt of the invoice as a “bill” from Spectrum. Counsel for Mr. Heine introduced several invoices into the record. On one group of invoices, including the December 29 invoice, the account number is listed as 7320. On the December 1 invoice, the account number is listed as 7321.
 

 We are of the opinion that Spectrum overcame its initial burden of proving that an open account balance of $637.16 existed between it and Westbank; the invoices introduced into the record on account number 7320 establish running dealings
 
 *885
 
 between Westbank and Spectrum and the December 29 invoice indicates that Spectrum extended a line of credit to West-bank.
 

 Thus, the burden then shifted to West-bank to prove the inaccuracy of the account or to prove that it was entitled to credits on the account. Westbank attempted to establish that it was entitled to a $860.76 credit on the December 29 invoice. Apparently, Mr. Kern believed that Westbank was entitled to a $360.76 | |ficredit on the December 29 invoice because the December 1 invoice indicated that Spectrum owed Westbank $360.76. However, Spectrum established at trial that Westbank had two separate accounts; Mr. Heine testified that account 7321 and 7320 were distinct accounts and introduced invoices into evidence to corroborate his testimony. Mr. Kern attempted to apply the $285.76 check to the charges on account number 7320. However, Westbank was entitled to the $360.76 credit on account number 7321, not account number 7320. Westbank never established at trial that it was entitled to a credit on account number 7320. Thus, we find that the trial court was not manifestly erroneous in determining that Westbank was entitled to twenty-five percent attorney’s fees on the $637.16 open account debt rather than the difference between the $637.16 balance due on the December 29 invoice and the $285.76 check Mr. Kern mailed to Mr. Heine.
 

 Accordingly, this assignment of error has no merit.
 

 CONCLUSION AND DECREE
 

 For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this appeal are taxed to Westbank.
 

 AFFIRMED
 

 [1]
 

 . Westbank does not dispute that it owes $637.19 on the account characterized by the trial judge as an open account. It only disputes the amount of attorney's fees due on the account.
 

 [2]
 

 . Mr. Kern did not sign the Contract.
 

 [3]
 

 . On the December 29 invoice, there is a box entitled "Account No.” In the box is the num-her "7320.1.” We assume this means that the December 29 invoice is the first invoice on account number 7320.
 

 [4]
 

 . We note that the check is now stale because it has been outstanding for longer than six months.
 
 See
 
 La. R.S. 10:4-404 cmt.
 
 Compare Charles Ragusa & Son v. Community State Bank,
 
 360 So.2d 231, 234 (La.App. 1 Cir.1978) ("[w]e believe that the payment of such an obviously stale check, three years old, demonstrates the bank's lack of due care.”).
 

 [5]
 

 . Spectrum was known as "Auto Parts & Accessories #1” at the time the Contract was executed.
 

 [6]
 

 .
 
 At trial, the trial court overruled Westbank’s objection.
 

 [7]
 

 . In the judgment, the trial court ruled that Westbank was liable to Spectrum "in the amount of ... ($7,070.96) under the contract for consignment" and that Westbank was liable to Spectrum in the amount of $637.16 "for debt owed by Defendant to Plaintiff under open account.” In addition, the trial court noted that Westbank was liable for “attorney's fees in the amount of twenty-five percent of the open account principal bal-anee." Thus, it is evident that the trial court awarded twenty-five percent attorney's fees on the $637.16 open account debt and not the $7,096.96 debt on the Contract. In addition, Spectrum does not contend on appeal that Westbank is liable to it for attorney’s fees on the alleged $7,070.96 debt. Accordingly, we will not address whether Spectrum is entitled to attorney’s fees on the $7,070.96 consignment debt.