FREDERICKA HOMBERG WICKER, Judge.
[ 2This is a civil matter. Plaintiff/appellant Maxine Rearick[1] appeals a judgment of the trial court finding that an act of donation of immovable property Ms. Rear-ick executed in favor of her daughter Dixie Michetti was valid. Ms. Rearick contends that the act of donation was made under duress. Alternatively, ■ Ms. Rearick contends that the act of donation should be nullified because Ms. Michetti was guilty of cruel treatment towards her. For the reasons that follow, we affirm the judgment of the trial court.
PROCEDURAL HISTORY
Ms. Rearick filed a Petition for Recognition as Owner of Immovable Property, for Injunction, and for Revocation of Donation for Ingratitude on March 9, 2009 alleging the following: (1) in December 2007, she was the sole owner of immovable property bearing municipal address 729 Cedar Avenue, Metairie, LA, (2) on December 19, 2007, Ms. Rearick’s daughter Ms. Michetti coerced her to | ¡¡donate the Cedar Avenue property, (3) Ms. Rearick agreed to donate the property to Ms. Michetti because Ms. Michetti threatened to place her in a nursing home, (4) the donation was made under duress and is therefore absolutely null, (5) alternatively, Ms. Rearick is entitled to revoke the donation pursuant to La. C.C. art. 1556 because Ms. Michetti was guilty of cruel treatment towards her.
That same day, the trial court issued a preliminary injunction restraining Ms. Mi-chetti from “verbally and physically abusing, harassing, injuring plaintiff, secreting [sic] plaintiffs medication, and interfering with plaintiffs freedom of movement.”
Trial in this matter was held on March 18, 2009. By judgment dated October 23, 2009, the trial court dismissed Ms. Rear-ick’s petition with prejudice. The trial court also ruled that the December 19, 2007 act of donation transferring ownership of the Cedar Avenue property to Ms. Michetti was valid. This appeal followed.
FACTS
The following facts were elicited from testimony at trial:
Ms. Michetti testified that she moved into the Cedar Avenue property with Ms. Rearick in August 2000. Before that time, she had been living with one of her daughters in a condominium. Ms. Michetti was her mother’s primary caregiver until 2005.
Ms. Michetti recalled an incident in 2005 when she got into a disagreement with her sister Patricia Petrie over their mother’s care. Ms. Michetti testified that Ms. Pe-trie invited a sick, elderly relative of Ms. Rearick’s to stay in the Cedar Avenue property. After the invitation, Ms. Mi-chetti told Patricia to not invite people to stay at the Cedar Avenue property. Ms. Petrie and Ms. Rearick became upset. Ms. Michetti also became upset and left the Cedar Avenue home. Ms. RMichetti testified that when she returned home one or two days later, she got into a physical altercation with Ms. Petrie and her other two sisters. Ms. Michetti further testified that one of her sisters was trying to hit her. Ms. Michetti called the police. When the police arrived, officers ordered Ms. Michetti to leave the Cedar Avenue property.
*433 Ms. Michetti eventually returned to the Cedar Avenue home, over the protestations of her sisters. Ms. Michetti testified that she agreed to resume her duties as her mother’s caregiver approximately one month after the altercation with her sisters. According to Ms. Michetti, she told her mother that she would move out of the Cedar Avenue property if her mother did not donate the property to her because she could not afford to be a caregiver without assurances that she would not be forced to leave. Ms. Michetti denied telling her mother that she would place her in a nursing home if her mother did not donate the property to her.
According to Ms. Michetti, her mother has problems eating, swallowing, drinking, and taking medication. Ms. Michetti indicated that she never controlled her mother’s medication, nor did she ever keep her sisters from visiting her mother. She did admit that she locked up her mother’s medication on the advice of her mother’s home health nurse because she was worried that her mother would take elevated doses of her medication. Ms. Michetti testified that her mother eventually asked her to leave the Cedar Avenue property after this suit was filed. Ms. Michetti testified that she never sought any consideration or money for the caregiver services she provided, that she never restricted her mother’s movements, and that she always properly administered her mother’s medicine. She further testified that she never prevented her mother from using her walker, that she never kicked a footstool out from underneath her mother’s legs, and that she never berated, abused, or yelled at her mother. Ms. Michetti admitted that she frequently |fi“spoke loudly” to Ms. Rearick but insisted that was necessary because Ms. Rearick is hard of hearing.
Ms. Rearick testified that Ms. Michetti moved in with her when Ms. Michetti came back from Oregon, even though she had initially denied her daughter’s request to move in. Ms. Rearick additionally testified that at the time Ms. Michetti moved into the Cedar Avenue property, she did not need caregiver assistance. According to Ms. Rearick, she donated the Cedar Avenue property to Ms. Michetti because she “felt sorry for her.” Ms. Rearick testified that her daughter was guilty of “cruel treatment” towards her. Ms. Rearick recalled that her daughter would kick a stool out from underneath her feet when her feet were propped up on the stool. Ms. Rearick additionally indicated that her daughter would place a blood pressure monitor on her stomach against her wishes. Ms. Rearick also recalled that Ms. Michetti yelled at her frequently and restricted her visitors, including her other daughters. Ms. Rearick testified that she was forced to move in with one of her daughters for a short period of time. Ms. Rearick indicated that Ms. Michetti told her that she would put her in a nursing home if she did not donate the Cedar Avenue property. Ms. Rearick testified that her daughter’s actions were offensive to her.
Ms. Rearick testified that she recalled being in an attorney’s office and that she recalled signing the act of donation in the attorney’s and Ms. Michetti’s presence. She also recalled that the attorney and Ms. Michetti signed the document. Ms. Mi-chetti testified that the two witnesses whose signatures also appear on the act of donation were not present when she signed the act of donation. Ms'. Rearick did not tell her other daughters that she had donated the property to Ms. Michetti until she was admitted to the hospital for high blood pressure. Ms. |sRearick recalled meeting with an elder protective services case worker on March 2, 2009. She did not know who called elder protective services.
*434 On cross-examination, Ms. Rearick admitted that from 2000 to 2005, her daughter applied for and picked up all her medicines, was a constant companion, sometimes cooked meals, bought groceries, helped her getting dressed, performed various household tasks, and took her to all of her hospital and doctor appointments.
Joanne Belflower, another of Ms. Rear-ick’s daughters, testified about an incident when Ms. Rearick asked her to spend a day at the Cedar Avenue house. Ms. Bel-flower agreed, but when she learned that Ms. Michetti would be present as well, she refused to spend any time with her mother and left. That evening, Ms. Rearick was admitted to the emergency room. Whilst in the hospital, Ms. Rearick told Ms. Bel-flower that she had donated the Cedar Avenue property to Ms. Michetti.
Ms. Belflower testified that she visited her mother frequently. She and Ms. Mi-chetti gradually reached an arrangement where they would not be in the Cedar Avenue house at the same time. Ms. Bel-flower indicated that she heard Ms. Mi-chetti yell at their mother over the phone and that Ms. Michetti had failed to feed their mother occasionally.
On cross-examination, Ms. Belflower testified she had called elder protective services regarding her mother’s care approximately 40 times. She was able to review an incident report that an elder protective services case worker created following a visit on March 2, 2009. Ms. Belflower testified that there were inaccuracies in the case worker’s report. The case worker ultimately concluded in the report that the report of abuse was unsubstantiated.
17Patricia Petrie testified .that she moved from Mission, Texas to Kenner to care for her mother after Ms.'Michetti moved out. According to Ms. Petrie, before moving to Kenner, she asked Ms. Rearick if she was a “prisoner” in her own home, to which Ms. Rearick replied ‘Tes.” She confirmed that she and Ms. Michetti had gotten into a fight in 2005 when she invited their mother’s sister to visit from Pennsylvania.
At the time of trial, Ms. Petrie was the primary caregiver for her mother. Ms. Petrie testified that her mother was able to make simple meals but that she could not use the stove. Her mother walks with the aid of a walker and dresses herself. On cross-examination, Ms. Petrie admitted that she had never seen Ms. Michetti mistreat her mother. She also admitted that she had been angry at her mother after she learned of the donation and admitted to leaving an angry phone message played at trial.
Valerie Oxner, the attorney who prepared the act of donation, testified that she had known Ms. Rearick for several years before Ms. Rearick donated the property to Ms. Michetti. According to Ms. Oxner, she and Ms. Rearick had discussed donating the Cedar Avenue property to Ms. Michetti on several occasions over a two or three-year period before Ms. Rearick executed the act of donation. These discussions took place at Ms. Oxner’s office and over the telephone. Ms. Oxner testified that, during these conversations, Ms. Rear-ick told her that she wanted to donate the Cedar Avenue property to Ms. Michetti because Ms. Michetti had taken care of her for many years. Ms. Rearick was concerned about losing all her rights in the Cedar Avenue property. Ms. Oxner and Ms. Rearick thereafter discussed the possibility of Ms. Rearick retaining a usufruct in the property.
IsMs. Oxner testified that Ms. Rearick finally decided to donate the property to Ms. Michetti in 2007. Before executing the act of donation, Ms. Rearick and Ms. *435 Michetti had a meeting at Ms. Oxner’s office. Ms. Oxner testified that during the 2007 meeting, there was nothing that led her to believe that Ms. Rearick was under duress. Ms. Oxner also indicated that, during the execution of the act of donation, both of the witnesses who signed the document were present in the room. Ms. Ox-ner asked Ms. Rearick if she had read the act of donation. Ms. Rearick thereafter indicated to Ms. Oxner that she had read the act of donation and that she understood it.
Dr. Robert Ryan, Ms. Rearick’s primary care physician for the past twenty-five years, testified that Ms. Rearick suffers from Parkinson’s disease, hypertension, arthritis, and mild dementia. Dr.. Ryan further testified that he had discussed Ms. Rearick’s family situation with Ms. Rear-ick on several occasions. According to. Dr. Ryan, Ms. Rearick’s family situation over the last several years has been “strained.” Dr. Ryan testified that he had seen no evidence that Ms. Michetti mistreated Ms. Rearick.
A letter signed by Dr. Ryan was introduced into the record. In the letter, Dr. Ryan indicated that he could not recall an occasion on which he noted any evidence of physical or emotional abuse of Ms. Rear-ick, The letter further indicates that Dr. Ryan had “seen only care and concern for [Ms. Rearnick’s] well being and comfort” on Ms. Michetti’s part.
Ashley Oglesby, Ms. Michetti’s son-in-law, testified that he had observed Ms. Michetti and Ms. Rearick together on many occasions. He never saw any evidence of abuse towards Ms. Rearick. In Mr. Oglesby’s opinion, Ms. Michetti did a good job of providing for Ms. Rearick.
IflSTANDARD OF REVIEW/FIRST SPECIFICATION OF ERROR
Ordinarily, in civil cases, the appropriate standard for appellate review of factual determinations is the manifest error/clearly wrong standard, which precludes the setting aside of a district court’s finding of fact unless, that finding is clearly wrong in light of the record reviewed in its entirety. The reviewing court should affirm the district court where the district court judgment is not clearly wrong or manifestly erroneous. One of the basic tenets of the manifest error standard of review is that “reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the court of appeal is convinced that had it been the trier of fact, it would have weighed the evidence differently.” Rando v. Anco Insulations Inc., 08-1163 (La.5/22/09), 16 So.3d 1065, 1087 (citing Parish Nat. Bank v. Ott, 02-1562 (La.2/25/03), 841 So.2d 749, 753).
However, in her first. specification of error, Ms. Rearick contends that, when ruling on her claim that the act of donation was executed under duress, the trial court committed legal error by applying the law and elements of proof applicable to the legal concept of nullification due to undue influence rather than the law and elements of proof applicable to the legal concept of nullification due to duress, which she pleaded in her petition.
La. C.C. art. 1479 provides:
A donation inter vivos or mortis „ causa shall be declared null upon proof that it is the product of influence by the do-nee or another person that so impaired the volition of the donor as to substitute the volition of the donee or other person for the volition of the donor, (emphasis added)
La. C.C. art. 1959 pertinently provides: .Consent is vitiated when it has been obtained by duress of such a nature as to cause -a reasonable fear of unjust and considerable injury to a party’s *436 person, property, or reputation, (emphasis added)
|10In ruling in favor of Ms. Michetti, the trial court stated in her oral reasons for judgment:
In this case plaintiffs have alleged three bases in which they have asked this court to consider in revoking donation of immovable property that was donated inter vivos by authentic act.
[[Image here]]
The first basis is that the donation was signed under conditions of duress. And a donation that is signed under duress should be declared null upon proof of duress.
[[Image here]]
In this case the plaintiff had to prove by clear and convincing evidence that the proof — I’m sorry — had to prove by clear and convincing evidence that the influence over the donor was such that it would have impaired the volition of the donor and to substitute the volition of the donee for the other person, or of the other person.
⅜ * *
I find that [Ms. Miehetti’s ultimatum] does not reach the level of duress as contemplated by 1479.” (emphasis added)
We agree that in her oral reasons for judgment, the trial court stated the law and elements of proof applicable to nullification due to undue influence rather than the law and elements of proof applicable to nullification due to duress. Moreover, the trial court referred to La. C.C. art. 1479, which is the codal article stating the law and elements of proof applicable to undue influence.
La. C.C. art. 1483 states that the person challenging a donation on the basis of fraud, duress, or undue influence, must prove his case by “clear and convincing evidence.” Concerning the type of undue influence that would result in the invalidity of a donation, Comment (b) to La. C.C. art. 1479 provides in pertinent part:
[E]veryone is more or less swayed by associations with other persons, so this Article attempts to describe the kind of influence that would cause the invalidity of a gift or disposition. Physical coercion and duress clearly fall within the proscription of the previous Article. The more subtle influences, Insuch as creating resentment toward a natural object of a testator’s bounty by false statements, may constitute the kind of influence that is reprobated by this Article, but will still call for evaluation by the trier of fact. Since the ways of influencing another person are infinite, the definition given in this Article is used in an attempt to place a limit on the kind of influence that is deemed offensive. Mere advice, or persuasion, or kindness and assistance, should not constitute influence that would destroy the free agency of a donor and substitute someone else’s volition for his own. (emphasis added)
On the other hand, Black’s Law Dictionary defines duress as a “threat of harm made to compel a person to do something against his or her will or judgment; esp., a wrongful threat made by one person to compel a manifestation of seeming assent by another person to a transaction without real volition.” Black’s Law Dictionary (8th ed.2004).
It is well-settled that a Court of Appeal may not set aside a trial court’s or a jury’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong.” Evans v. Lungrin, 97-0541 (La.2/6/98), 708 So.2d 731, 735 (citing Rosell v. ESCO, 549 So.2d 840, 844 (La.1989)). However, where one or more trial court legal errors interdict the fact finding process, the man *437 ifest error standard is no longer applicable, and if the record is otherwise complete, the appellate court should make its own independent de novo review of the record and determine whether the plaintiff has borne his or her burden of proof. Evans, 708 So.2d at 785. A legal error occurs when a trial court applies incorrect principles of law and such errors are prejudicial. Id. (citing Lasha v. Olin Corp., 625 So.2d 1002, 1006 (La.1993)). Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights. Id.
In this case, the trial court committed a legal error. In her oral reasons for judgment, the trial court stated Ms. Rearick failed to prove by clear and convincing evidence “that the influence over the donor was such that it would have impaired the volition of the donor and to substitute the volition of the donee.” Thus, the trial 11 ¡.court applied the legal standard applicable to undue influence rather than duress to Ms. Rearick’s claims. Duress and undue influence are related concepts. However, as the comment to La. C.C. art. 1479 and the definition of “duress” in Black’s Law Dictionary illustrate, undue influence is a slow process wherein the donee overcomes the free agency of the donor and substitutes someone else’s volition while duress is an immediate threat of harm intended to compel the donee to act against his own volition. Accordingly, we find that the trial court’s legal error may have interdicted the fact finding process. See by analogy Evans v. Lungrin, 97-0541 (La.2/6/98), 708 So.2d 731, 786 (holding that legal error interdicted the trial court’s fact-finding process when trial court’s reasons for judgment applied previous version of Civil Code article to custody dispute).
We agree that the trial court erred in its application of legal principles regarding duress, thus, we will review the question of nullification due to duress in Ms. Rearick’s second specification of error de novo.
SECOND SPECIFICATION OF ERROR
In her second specification of error, Ms. Rearick contends that the trial court erred in failing to find that Ms. Michetti obtained her consent to sign the act of donation by duress. Ms. Rearick further contends that the act of donation is null because it was the product of duress.
A donation inter vivos shall be declared null upon proof that it is the product of fraud or duress. La. C.C. art. 1478. Consent is vitiated when it has been obtained by duress of such a nature as to cause a reasonable fear of unjust and considerable injury to a party’s person, property, or reputation. La. C.C. art.1959. Duress vitiates consent also when the threatened injury is directed against the spouse, an ascendant, or descendant of the contracting party. La. C.C. art. 1960. Duress is to be considered in light of subjective characteristics of the person whose 11sconsent is in question; however, duress must be of such a nature as to cause a reasonable fear of unjust and considerable injury to a party’s property in order to constitute legal duress. See, e.g., Monterrey Center, LLC v. Education Partners, Inc., 08-0734 (La.App. 1 Cir. 12/23/08), 5 So.3d 225, 230.
In order to prove duress one:
[m]ust prove it by clear and convincing evidence. However, if, at the time the donation was made or the testament executed, a relationship of confidence existed between the donor and the wrongdoer and the wrongdoer was not then related to the donor by affinity, consanguinity or adoption, the person who challenges the donation need only prove the fraud, duress, or undue influ *438 ence by a preponderance of the evidence.
La. C.C. art. 1483 (emphasis added).
The “clear and convincing” standard requires a party to prove the existence of a contested fact is highly probable, or much more probable than its non-existence. Talbot v. Talbot, 2003-0814 (La.12/12/03), 864 So.2d 590, 598.
After a de novo review of the record, we find that Ms. Rearick has not demonstrated by clear and convincing evidence that she signed the act of donation under duress. Ms. Rearick relies heavily on her testimony to the effect that Ms. Michetti threatened to place her in a nursing home if she did not donate the property to her daughter. However, earlier in her testimony, Ms. Rearick testified that she donated the property to her daughter because she “felt sorry for her.” Counsel for Ms. Rearick thereafter asked Ms. Rearick if there was “any other reason” why she donated the property to Ms. Michetti. Ms. Rearick replied “No.” In addition, although Ms. Rearick testified that her daughter threatened to place her in a nursing home, there was no testimony indicating that Ms. Michetti’s purported threat influenced Ms. Reariek’s decision to donate the Cedar Avenue property.
Furthermore, Ms. .Oxner testified that she and Ms. Rearick had discussed the possibility of donating the Cedar Avenue house to Ms. Michetti several times over |ua considerable period of time before Ms. Rearick executed the act of donation. Ms. Oxner also testified that Ms. Rearick asked her pertinent questions when they met and that Ms. Rearick asked her to include a usufruct clause in the act of donation. Ms. Oxner further testified that she at no time saw evidence that Ms. Michetti mistreated Ms. Rearick or subjected her to duress.
Ms. Michetti testified that she cared for her mother over a period of approximately five years. On cross-examination, Ms. Rearick testified that her daughter picked up all her medicines, cooked meals, bought groceries, helped her getting dressed, performed various household tasks, and generally acted as a good caregiver. • Ms. Mi-chetti also denied telling her mother that she would place her in a nursing home if her mother did not donate the property to her.
Ms. Michetti admitted that she told her mother that she would move out of the Cedar Avenue property if her mother did not donate the property because she needed assurances that she would not be forced to leave by her mother or sisters. We find that this admission is insufficient to prove that Ms. Rearick signed the act of donation under duress by clear and convincing evidence. The case with the closest facts to this one is Guerin v. Guerin, 449 So.2d 1053 (La.App. 1 Cir.1984), unit denied, 450 So.2d 960 (La.1984). In Guerin, a man transferred immovable property to his son prior to his death. After his death, his widow and her other children brought an action to set aside the transfer. The widow contended she never consented to transfer the property and was forced to sign the act of sale against her will because her husband told her that he would leave her if she did not sign the transfer papers. Id, at 1058. On appeal, the First Circuit stated that this was “patently insufficient” to show that the transfer was obtained as a result of fraud or duress. Id. Ms. Michetti’s threat is similarly insufficient.
In addition, La. C.C. art. 1962 provides: |1{iA threat of doing a lawful act or a threat of exercising a right does not constitute duress.
A threat of doing an act that is lawful in appearance only may constitute duress.
*439 Ms. Michetti contends that her ultimatum to her mother was a “lawful act or a threat of exercising a right” and that the ultimatum cannot constitute duress. Ms. Rearick contends that the ultimatum was merely “lawful in appearance” and that it “only may constitute duress.” In her brief, Ms. Rearick argues that “threatening to withhold nursing care and abandon her mother may be lawful but that does not make it right.” Implicit in the argument, therefore, is that an act that is not “right” is “lawful in appearance only.” That, however, is not the correct standard,
In Wolf v. Louisiana State Racing Com’n, 545 So.2d 976, 980 (La.1989), the Louisiana Supreme Court interpreted the phrase “lawful in appearance only” to apply to acts that are “unlawful, even though clothed with the appearance of legality.” Wolf involved an agreement whereby the Fair Grounds race track agreed to pay worker’s compensation benefits to an injured jockey in exchange for the jockey’s waiver of the right to sue the track for its negligence. Id. at 976-77. Several jockeys signed the agreement under protest and filed suit against the Fair Grounds and the Louisiana State Racing Commission seeking a declaratory judgment to have the agreement invalidated. The Louisiana Supreme Court determined that the Fair Grounds had no authority to enter into such agreements with jockeys, such authority being vested in the stewards and the Louisiana State Racing Commission. Id. at 980. The Fair Grounds’ actions were “lawful in appearance only” because Fair Grounds officials represented that they had the legal authority to enter into the agreement with the jockeys when, in fact, the officials had no legal authority to do so.
|1fiIn this case, even if we were to assume that Ms. Michetti threatened to place her mother in a nursing home, that threat would be a “lawful act” incapable of rendering the act of donation void for duress. Ms. Rearick admits this in her brief. The threat would not be “lawful in appearance only” merely because it violates Ms. Rear-ick’s preconceived surmise of what is right and wrong.
Finally, we note that, although Ms. Rearick did not plead undue influence in her petition, there is no evidence in the record that Ms. Michetti exerted undue influence over Ms. Rearick. In her brief to this court, Ms. Rearick admitted that she “was not attempting to prove' that she had lost her volition to [Ms. Michetti], but rather that she was indeed aware at the time of the donation that she was being coerced into the action.”
Accordingly, this specification of error has no merit.
THIRD SPECIFICATION OF ERROR
In her final specification of error, Ms. Rearick contends that the trial court erred in failing to determine that her daughter was guilty, of “cruel treatment” towards her. In her brief, Ms. Rearick contends that “specific incidents of cruelty may seem individually minor, but they accumulated to the point that Mrs. Rearick feared that she was being held a prisoner in her own home.” Ms. .Rearick concludes that because her daughter was guilty of cruel treatment towards her, she should be permitted to revoke the act of donation wherein she donated the Cedar Avenue property to her daughter.

Standard of Review

Although we reviewed Ms. Rear-ick’s duress claim de novo, Ms. Rearick is not entitled to a de novo review of the record with respect to her revocation claim. Our standard of review on this specification of error is whether the trial court committed manifest error or was clearly wrong in determining whether Ms. *440 117Michetti committed a “grevious injury” upon Ms. Rearick. A trial' court’s determination as to whether a donee has committed a “grievous injury” upon a donor is a factual determination which depends heavily on the facts and circumstances specific to the case. Erikson v. Feller, 04-1088 (La.App. 3 Cir. 12/8/04), 889 So.2d 430, 434. A court of. appeal may not set aside a trial court’s finding of fact in the absence of manifest error or unless it is clearly wrong. Stobart v. State, through Dept. of Trans, and Development, 92-1328 (La.4/12/93), 617 So.2d 880, 882. When reviewing findings of fact, the issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the conclusion was a reasonable one. Adams v. Rhodia, Inc., 07-2110 (La.5/21/08), 983 So.2d 798, 806.

Analysis

Donations inter vivos are generally irrevocable. Busse v. Lambert, 00-1032 (La.App. 5 Cir. 10/31/00), 773 So.2d 182, 183, writ denied, 00-3224 (La.1/26/01), 782 So.2d 633. See also La. C.C. art. 1468 (“[a] donation inter vivos is a contract by which a person, called the donor, gratuitously divests himself, at present and irrevocably, of the thing given in favor of another.”). However, the Louisiana Civil Code does allow for the revocation of an inter vivos donation for four express causes, one of which is the “ingratitude of the donee.” La. C.C. art. 1556. Revocation on account of ingratitude can only take place if the donee has “attempted to take the life of the donor” or if the donee “has been guilty towards [the donor] of cruel treatment, crimes, or grievous injuries.” La. C.C. art. 1557.
As we noted in Salassi v. Salassi, 08-510 (La.App. 5 Cir. 5/12/09) 13 So.3d 670, 673, “there is a considerable paucity of Louisiana cases that have addressed what constitutes ‘cruel treatment, crimes, or grievous injuries.’ ” In Perry v. Perry, 507 So.2d 881, 883 (La.App. 4 Cir.1987), writ denied, 512 So.2d 465, (La.1987), the Fourth Circuit Court of Appeal noted that:
“[injuries’’ include any act naturally offensive to the donor. It may be the adultery of one of the spouses.... The act may consist of slanderous charges; of a seizure levied by the donee against the donor of whom he is creditor; or, in a proper case, even of the refusal to consent to the revocation.
(citing 4 C. Aubry & C. Rau, Cours de ÜROit Civil Francais, §■ 708 (La. State Law Institute Trans. Yol. 3, 1965)) (emphasis added).
In this case, the trial court concluded that Ms. Michetti’s actions did not rise to the level of cruel treatment and grievous injury under La. C.C. art. 1557. At trial, Ms. Rearick described several of 'Ms.'Mi-chetti’s actions that were “naturally offensive” to her. Ms. Rearick indicated that Ms. Michetti “yelled” at her, placed a blood pressure monitor on her stomach, and kicked a stool from underneath her feet on several occasions. Ms. Rearick also testified that Ms. Michetti controlled her medication and restricted her visitors.
None of these purported actions could be independently confirmed at trial. Ms. Michetti indicated that she had to speak loudly to Ms. Rearick because Ms. Rearick is hard of hearing. Ms. Michetti denied kicking a stool from underneath her mother’s feet or placing a blood pressure monitor on her mother’s stomach. She also denied that she restricted Ms. Rearick’s visitors. She explained that she controlled her mother’s medication at the suggestion of both Dr. Ryan and the home health nurse. Dr. Ryan opined that Ms. Rearick suffers from dementia, therefore, this action is reasonable. None of Ms. Michetti’s sisters could verify Ms. Rearick’s accusa *441 tions. In addition, we note that elder protective services visited Ms. Rearick’s home and concluded that reports of abuse were “unsubstantiated” and that Dr. Ryan’s letter indicates that he could not recall an occasion on which he noted any evidence of physical or emotional abuse of Ms. Rear-ick.
11!)Even if we were to assume that Ms. Rearick’s accusations are true, a review of reported jurisprudence reveals that Ms. Michetti’s actions do not rise to the level of “cruel treatment, crimes or grievous injuries,” as required by La. C.C. art. 1560. See, e.g., Whitman v. Whitman, 31,814 (La.App. 2 Cir. 3/31/99) 730 So.2d 1048 (finding no error in trial court’s ruling that donor’s adulterous affair constituted cruel treatment when donee was his wife), Erikson v. Feller, supra, (holding that grandson’s conduct in attempting to evict grandfather from property and. making veiled allegations that grandfather had molested grandson’s child constituted cruel treatment and grievous injury); Perry v. Perry, supra (finding no error in trial court’s ruling that son’s having directed the sheriff to seize personal property of his parents constituted cruel treatment and grievous injury).
We do not find that the trial court’s conclusion on this issue was unreasonable or manifestly erroneous. Based on the foregoing, this specification of error is without merit.
FRIVOLOUS APPEAL
Ms. Michetti has requested this Court to award attorneys fees for a frivolous appeal. However, Ms. Michetti failed to cross-appeal or to answer the appeal. As such, we are precluded from considering Ms. Michetti’s request for attorneys fees. La. C.C.P. arts. 2082 and 2133; Vicknair v. St. James Parish School Bd., 06-381 (La.App. 5 Cir. 10/31/06), 945 So.2d 116, 119.
CONCLUSION AND DECREE
For the foregoing reasons, the trial court’s judgment is affirmed.

AFFIRMED

. Maxine Rearick died on May 21, 2010, during the course of the litigation. On August - 26, 2010, Patricia Rearick Petrie, Joanne Rearick Belflower, and Linda Rearick Tillman, Ms. Rearick's daughters, were substituted as parties appellants in the litigation.