STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

16-764

THOMAS J. BELL, SR.

VERSUS

THE CITY OF LAKE CHARLES

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2015-4786
HONORABLE SHARON D. WILSON, DISTRICT JUDGE

**********

VAN H. KYZAR
JUDGE

**********

Court composed of Marc T. Amy, D. Kent Savoie, and Van H. Kyzar, Judges.

REVERSED.

Billy E. Loftin, Jr.
Loftin, Cain & LeBlanc, L.L.C.
113 Dr. Michael DeBakey Drive
Lake Charles, LA 70601
(337) 310-4300
COUNSEL FOR DEFENDANT/APPELLANT:
    The City of Lake Charles

Todd S. Clemons
Todd Clemons & Associates
1740 Ryan Street
Lake Charles, LA 70601
(337) 477-0000
COUNSEL FOR PLAINTIFF/APPELLEE:
    Thomas J. Bell, Sr.

Adam P. Johnson
Johnson & Vercher, L.L.C.
910 Ford Street
P.O. Box 849
Lake Charles, LA 70602
(337) 433-1414
COUNSEL FOR PLAINTIFF/APPELLEE:
    Thomas J. Bell, Sr.

**KYZAR, Judge.**

The defendant, the City of Lake Charles, appeals from a district court judgment reversing the decision of the Lake Charles Municipal Fire and Police Civil Service Board to uphold the termination of the plaintiff, Thomas J. Bell, Sr., from the Lake Charles Police Department, and ordering his immediate reinstatement with back pay. For the following reasons, we reverse and reinstate the decision of the Lake Charles Municipal Fire and Police Civil Service Board.

## DISCUSSION OF THE RECORD

On May 19, 2015, Thomas J. Bell, Sr., Deputy Chief of Police of the Investigations Bureau (Detective Division) of the Lake Charles Police Department (LCPD), was informed by Donald D. Dixon, Chief of Police, that he was being placed on paid administrative leave pending the outcome of an administrative investigation into alleged conduct committed by him. A Corrective Action Report, dated that same day, indicated that an investigation into Bell's actions was being referred to the LCPD Administration in regards to a March 23, 2015 incident. The report stated that an administrative investigation of Bell's administrative assistant, Jeanine Blaney, indicated that he had committed "infractions of law and policy" as Blaney's direct supervisor. The report further alleged that Bell allowed Blaney to attend class while on duty without any corresponding alteration to her reported work hours or her use of vacation or compensatory time for the hours she attended class at McNeese State University (McNeese); that Blaney failed to work a full eight-hour day during March 2015; that she was paid overtime on days that she attended school and failed to work a full day; and that Bell utilized Blaney for personal matters during work hours, including completing his own online course work for McNeese. The report also alleged that statements provided by Blaney

and Captain Arnold Bellow, the second ranking officer in the Detective Division, directly conflicted with a statement provided by Bell.

On June 9, 2015, Chief Dixon served Bell with a pre-disciplinary or *Loudermill*[1] hearing notice, which indicated that he was considering imposing severe disciplinary action, up to termination, on Bell based on the administrative investigation's findings of three sustained violations of the following LCPD Code of Conduct:

1. 4.07 False or Inaccurate Statements and Reports

   An employee shall not knowingly make, or cause or allow to be made, a false or inaccurate oral or written record or report of an official nature, or intentionally withhold material matter from such report or statement. These reports include but are not limited to:

   . . . .

   - **False Reporting of Work Records**: No employee intentionally shall falsify work records to include: regular hours worked; overtime hours worked; compensatory time where hours claimed were not worked; or any applicable incentive pay not due the employee by action or definition.

2. 3.01 Adherence to Law

   Employees shall act in accordance with the constitutions, statutes, ordinances, and the official interpretations thereof, of the United States of America, the State of Louisiana, the Parish of Calcasieu, and the City of Lake Charles. . . .

3. 3.17 Neglect of Duty

   **Supervisory Responsibility**

   A sworn employee with supervisory responsibility shall be in violation of neglect of duty whenever he fails to properly supervise subordinates, or when his actions in matters relating to discipline fail to conform within the dictates of Departmental Rules and Regulations and/or established law.

---

[1] *Cleveland Bd. of Education v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487 (1985).

**General**

> Each employee, because of their grade and assignment, is required to perform certain duties and assume certain responsibilities. An employee's failure to properly function in either or both of these areas constitutes a neglect of duty.

> The following acts or omissions to act, although not exhaustive, are considered neglect of duty:

> . . . .

> ▪ Failure of a supervisor to approve and/or confirm hours worked and/or hours of leave taken by their employees.

Following a June 19, 2015 pre-disciplinary hearing, at which Bell, who was represented by counsel, presented no witnesses or evidence, Chief Dixon determined that the findings of the administrative investigation constituted sustained violations of the three Code of Conduct provisions and the provisions of La.R.S. 33:2500. Based on these findings, Chief Dixon recommended that Bell's employment be terminated effective the close of business June 24, 2015. Chief Dixon's recommendation was approved by Randy Roach, the Mayor of Lake Charles, and Bell received notification of his termination in a June 22, 2015 letter.

On June 25, 2015, Bell filed a written request to appeal his termination by the City of Lake Charles (the City) to the Lake Charles Municipal Fire and Police Civil Service Board (the Board). Following public hearings held on October 7-8, 2015, and October 26-27, 2015, the Board, based on a four-to-one vote, approved a motion to find that the Appointing Authority (the Mayor) acted in good faith and for just cause in its termination of Bell. In doing so, it stated the following findings of fact: "Through written documentation, investigative findings constituted Sustained Violations of the Lake Charles Police Department Policies contained in A6, Code of Conduct."

3

On November 25, 2015, Bell appealed the Board's decision upholding his termination to the Fourteenth Judicial District Court, sitting as a reviewing court pursuant to La.R.S. 33:2501(E)(1), alleging two grounds for reversal:

1. The City's termination of Deputy Chief Bell is an absolute nullity.

2. The Board's erroneous findings.

Following an April 4, 2016 hearing, the district court took the matter under advisement. Thereafter, on April 8, 2016, it rendered oral reasons for judgment, dismissing Bell's first ground for reversal, but, after finding that the Board's findings of fact were inappropriate, it overturned the Board's decision and ordered the immediate reinstatement of Bell, with full pay and benefits retroactive to the date of his termination. A written judgment was executed by the district court to this effect on April 25, 2015. The City then perfected a suspensive appeal of the district court's judgment.

On appeal, the City argues generally that the district court was manifestly erroneous in reversing the Board's decision because the record supports a finding that it was made in good faith and for just cause. In doing so, the City makes two arguments for why the district court's judgment should be reversed:

1. The Trial Court used the wrong standard of review in reversing the decision of the Civil Service Board.

2. The Trial Court (on Appellate Review) committed manifest error in failing to defer to the Civil Service Board's (Trier of Fact) findings of fact which were more than reasonably supported by credible evidence in the record.

**OPINION**

The procedures applicable to Bell's appeal from the Board's decision are provided by La.R.S. 33:2501(E), which provides:

(1) Any employee under classified service and any appointing authority may appeal from any decision of the board, or from any

4

action taken by the board under the provisions of the Part that is prejudicial to the employee or appointing authority. This appeal shall lie direct to the court of original and unlimited jurisdiction in civil suits of the parish wherein the board is domiciled.

(2) The appeal shall be taken by serving the board, within thirty days after entry of its decision, a written notice of the appeal, stating the grounds thereof and demanding that a certified transcript of the record, or written findings of facts, and all papers on file in the office of the board affecting or relating to such decision, be filed with the designated court. The board shall, within ten days, after the filing of the notice of appeal, make, certify, and file the complete transcript with the designated court, and that court shall thereupon proceed to hear and determine the appeal in a summary manner.

(3) This hearing shall be confined to the determination of whether the decision made by the board was made in good faith for cause under the provisions of this Part. No appeal to the court shall be taken except upon these grounds and except as provided in Subsection D of this Section.

The supreme court expounded on these procedures in *Shields v. City of Shreveport*, 579 So.2d 961, 964 (La.1991), when it stated:

When conducting a hearing on an appeal of a disciplinary action, a civil service board must vacate the decision of the appointing authority if it finds "that the action was not taken in good faith for cause." La.R.S. 33:2501(C)(1). The "cause" must be one of the causes specified in La.R.S. 33:2500. A board may affirm the appointing authority's action only "if the evidence is conclusive." La.R.S. 33:2501(C)(1). The appointing authority must prove its case by a preponderance of the evidence. *Linton v. Bossier City Mun. Fire & Police Board*, 428 So.2d 515 (La.App.2d Cir.1983). On appeal from an adverse decision of a civil service board, the hearing shall "be confined to the determination of whether the decision made by the board was made in good faith for cause under the provisions of this Part. No appeal to the court shall be taken except upon these grounds. . . ." La.R.S. 33:2501(E)(3). Our review of a civil service board's findings of fact is limited. Those findings are entitled to the same weight as findings of fact made by a trial court and are not to be overturned in the absence of manifest error. *City of Kenner v. Wool*, 433 So.2d 785, 788 (La.App. 5th Cir.1983).

In *Townsend v. City of Leesville*, 14-923, p. 2 (La.App. 3 Cir. 2/4/15), 158 So.3d 263, 266, *writ denied*, 15-703 (La. 6/1/15), 171 So.3d 263, this court discussed the concept of "good faith" and "cause" in the context of a civil service appeal:

Good faith fails to occur when the appointing authority acts arbitrarily or capriciously or results from prejudice or political expediency. *Martin v. City of St. Martinville*, 321 So.2d 532 (La.App. 3 Cir.1975), *writ denied*, 325 So.2d 273 (La.1976). Arbitrary or capricious behavior occurs when there is a lack of a rational basis for the action taken. *Shields v. City of Shreveport*, 579 So.2d 961 (La.1991).

"Legal cause for disciplinary action exists if the facts found by the commission disclose that the conduct of the employee impairs the efficiency of the public service." *Leggett v. Nw. State Coll.*, 242 La. 927, 140 So.2d 5, 9 (1962). A real and substantial relationship must be maintained "between the conduct of the employee and the efficient operation of the public service; otherwise legal cause" fails to exist and "any disciplinary action by the commission is arbitrary and capricious." *Id.* at 10. The action taken by the appointing authority "must be set aside if it was not taken 'for cause,' even though it may have been taken in good faith." *Martin*, 321 So.2d at 535.

## FIRST ARGUMENT FOR REVERSAL

In its first argument for reversal, the City argues that the district court applied the wrong standard of review in reversing the Board's decision and then substituted its own factual findings for those of the Board in finding that it acted arbitrarily and capriciously in affirming Bell's termination.

In *Townsend*, 158 So.3d at 267, this court again reviewed the burden of proof and standard of review applicable in civil service matters:

"The [a]ppointing [a]uthority has the burden of proving by a preponderance of the evidence the occurrence of the complained of activity and that the conduct complained of impaired the efficiency of the public service." *Fernandez v. New Orleans Fire Dep't*, 01-436, p. 4 (La.App. 4 Cir. 2/6/02), 809 So.2d 1163, 1165. A classified employee has a property right in his employment which he cannot be deprived of without legal cause and due process. *Moore v. Ware*, 01-3341 (La.2/25/03), 839 So.2d 940. The trial court accords deference to a civil service . . . board's factual conclusions which should not be overturned unless they are manifestly erroneous. *Shields* [*v. City of Shreveport*], 579 So.2d 961 [(La. 1991)]. Likewise, the intermediate appellate court and our review of a civil service board's factual findings are limited. *Id.* Those findings, which are entitled to the same weight as the trial court's factual findings, cannot be overturned in the absence of manifest error. *Id.*

In its oral reasons for judgment, the district court stated the following with regards to the standard of review it was applying in this matter:

6

Each case must be decided on its own facts with substantial deference afforded to the appointed authority. Reviewing courts should not second guess the appointing authority's decision but only intervene when decisions are arbitrary and capricious or characterized by an abuse of discretion.

This court is well aware that that is the standard that I am to review everything that was done by the civil service board. I must say though that I do agree with Mr. Clemmons that the findings of fact are very conclusionary and in this court's opinion they are inappropriate findings of fact because findings of fact should actually tell the reviewing court exactly which facts the board relied on as opposed to a conclusionary statement that the violations constitute sustained violations.

So, given that I am given very little in the findings of fact, this court reviewed the allegations that are contained within the allegations brought by the city before the civil service board.

Although the district court referenced the appointing authority twice, we find that it laid out the proper appellate standard applicable to the Board's decision in this matter. However, we find that the district court erred in conducting a *de novo* review of the matter after finding that the Board's written findings of fact were inappropriate. The Board's written findings of fact stated:

> Through written documentation, investigative finding constituted Sustained Violations of the Lake Charles Police Department Policies contained in A6, Code of Conduct.

However, the Board is only required to provide written findings of fact if neither the employee nor the appointing authority arrange for a certified transcript of the record. Louisiana Revised Statutes 33:2501(B)(3) directly provides as follows:

> The board shall have complete charge of any such hearing and investigation, and may conduct it in any manner it deems advisable, without prejudice to any person or party thereto. The procedure followed shall be informal and not necessarily bound by the legalistic rules of evidence. The board shall not be required to have the testimony taken and transcribed, but either the employee or the appointing authority may, at their own expense, make the necessary arrangements therefor. In such cases the board may name any competent shorthand reporter as the official reporter. If the testimony is not taken or transcribed, then the board shall make a written finding of fact.

7

In this instance, a certified transcript was provided; thus, the Board was not required to provide written findings of fact. Accordingly, we find no merit in this argument for reversal, but we do find that the district court erred by conducting a *de novo* review of the record and substituting its findings of fact for those of the Board.

## SECOND ARGUMENT FOR REVERSAL

Next, the City argues that it was manifestly erroneous for the district court to reverse the Board's decision. We agree.

In *Hayes Fund for First United Methodist Church of Welsh, LLC v. Kerr-McGee Rocky Mountain, LLC*, 14-2592, pp. 8-10 (La. 12/8/15), 193 So.3d 1110, 1115-1117, the supreme court recently reiterated the well-known appellate standard of review:

> In all civil cases, the appropriate standard for appellate review of factual determinations is the manifest error-clearly wrong standard, which precludes the setting aside of a trial court's finding of fact unless that finding is clearly wrong in light of the record reviewed in its entirety. *Cenac v. Public Access Water Rights Ass' n*, 02-2660, p. 9 (La.6/27/03), 851 So.2d 1006, 1023. Thus, a reviewing court may not merely decide if it would have found the facts of the case differently. *Hall v. Folger Coffee Co.*, 03-1734, p. 9 (La.4/14/04), 874 So.2d 90, 98. Rather in reversing a trial court's factual conclusions with regard to causation, the appellate court must satisfy a two-step process based on the record as a whole: there must be no reasonable factual basis for the trial court's conclusion, and the finding must be clearly wrong. *Stobart v. State through Dept. of Transp. and Development*, 617 So.2d 880, 882 (La.1993).
>
> This test requires a reviewing court to do more than simply review the record for some evidence, which supports or controverts the trial court's findings. The court must review the entire record to determine whether the trial court's finding was clearly wrong or manifestly erroneous. *Parish Nat. Bank v. Ott*, 02-1562, pp. 7-8 (La.2/25/03), 841 So.2d 749, 753-54. The issue to be resolved on review is not whether the judge or jury was right or wrong, but whether the judge's or jury's factfinding conclusion was a reasonable one. *Rosell v. ESCO*, 549 So.2d 840, 844 (La.1989); *Canter v. Koehring Co.*, 283 So.2d 716, 724 (La.1973).

Notably, reasonable persons frequently can and do disagree regarding causation in particular cases. But where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. *Rosell*, 549 So.2d at 844. In this regard,

> . . . the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts.

*Perkins v. Entergy Corp.*, 00-1372, p. 10 (La.3/23/01), 782 So.2d 606, 612-13.

Accordingly, an appellate court on review must be cautious not to re-weigh the evidence or to substitute its own factual findings just because it would have decided the case differently:

> [w]hen findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.

*Rosell*, 549 So.2d at 844-45 (citations omitted).

While we understand and appreciate the reality that many times we would have judged the case differently had we been the trier of fact, this is not our function as a reviewing court. *Menard v. Lafayette Ins. Co.*, 09-1869, p. 21 (La.3/16/10), 31 So.3d 996, 1011. We give great deference to the trial court because it observes and participates

9

in the live presentation, while the appellate court merely reviews the cold transcript. This is why we have said:

> The manifest error doctrine is not so easily broached. Rarely do we find a reasonable basis does not exist in cases with opposing views. We note it is not hard to prove a reasonable basis for a finding, which makes the manifest error doctrine so very difficult to breach, and this is precisely the function of the manifest error review. A reviewing court only has the "cold record" for its consideration while the trier of fact has the "warm blood" of all the litigants before it. This is why the trier of fact's findings are accorded the great deference inherently embodied in the manifest error doctrine. So once again we say it should be a rare day finding a manifest error breach when two opposing views are presented to the trier of fact.

*Menard*, 09-1869 at pp. 21-22, 31 So.3d at 1011.

### *Record before the Board*

The record before the Board established that Blaney was classified as a records clerk with the LCPD, a position that entailed a forty-hour work week and an eight and one-half-hour work day, running from 7:30 a.m. through 4:00 p.m., including a thirty-minute lunch break. Leave was only allowed with the prior approval of a supervisor via a leave request form. Attendance was noted daily on a daily attendance report submitted to payroll by a division's supervisor. The report contained a list of the employees, their daily work schedules indicated by their hourly start and end times, and numbered codes, which indicated whether the employee was working or on leave. Overtime pay was only available, if approved by a supervisor, to those employees that had already worked forty hours that week or eight hours on the date of their application. The testimony established that the overtime system in the LCPD was based on the honor system; a supervisor had to assume that the requesting employee qualified for overtime because the supervisor had no way to verify the requesting employee's hours.

10

The record further established that Blaney, with Bell's approval, attended class at McNeese on Tuesdays and Thursdays, during work hours.[2] It established that Bell, as Deputy Chief, never approved Blaney's daily attendance reports or overtime requests from the time she transferred to the Detective Division, until she was placed on administrative leave on March 13, 2015. The daily attendance report was filled out by a records clerk each morning and approved by the records clerks' supervisor before it was sent to the City's payroll department. Major Al Moore supervised the Detective Division records clerks at the time of Blaney's transfer. Records Clerk Christina Etienne claimed that both Bell and Major Moore informed her that because Blaney was attending McNeese, she was to list her eight and one-half-hour work day as beginning when she arrived at work after class, rather than 7:30 a.m., and ending eight and one-half hours later. Major Moore retired effective October 31, 2014. Jermel Batiste, who took over from Etienne when she went on sick leave, stated that Lieutenant Donald Cooper, the new supervisor, told her to leave Blaney's work hours as 7:30 a.m. to 4:00 p.m. on Tuesdays and Thursdays because she was making up the hours she missed to attend class.

The daily attendance reports established that Blaney's work hours changed on January 12, 2015, from 7:30 a.m. to 4:00 p.m. to 8:00 a.m. to 4:00 p.m. This change was approved by Bellow, the records clerks' supervisor, after Lieutenant Cooper's transfer to another division. That same day at a personnel meeting, Bell announced that he was appointing Blaney to be his and Bellow's administrative assistant, despite the fact that no such position existed in the civil service system. Etienne and Batiste both claimed that Bell stated that anyone who had a problem

---

[2] The record established that Blaney had been authorized to attend classes at McNeese during work hours since 2007, when she was assigned to a different division of the LCPD.

11

with Blaney's promotion should apply for a transfer or resign. At this same meeting, which occurred prior to the Detective Division's relocation back to its remodeled office, all personnel, records clerks and detectives, were informed that overtime would not be allowed for the move. Despite this warning, Blaney requested and was approved by Bellow for three hours of overtime for packing and moving to the new office on January 25-26, 2015.

The record also established that Bell was approached on multiple occasions concerning Blaney's failure to wear a uniform and her overtime. Etienne testified that she approached Bell regarding Blaney's failures to wear a uniform and to work eight hours, and was told not to worry about it, "I got this." Major Moore testified that after confronting Blaney about her refusal to wear a uniform, he was told by Bell that "she answered to him, he had her, she was gonna wear civilian clothes." Major Moore further stated that Blaney received no overtime while he supervised her and that she was present the majority of the nights when he worked until 9:00 p.m. Bellow testified that he approached Bell regarding Blaney's overtime on weekends, but was told by Bell, "[D]on't worry about it, I got it." "[I]f DC Kraus can have a secretary, she can work, then I can have a secretary, she can work." Although Bellow felt that the overtime was unnecessary, he stated that he did as ordered and approved Blaney's requests. However, he admitted that the Detective Division was short-handed and that the records clerks had a standing offer to work overtime beginning in December 2014, and that Blaney was the only records clerk who accepted the offer.

The record further established that Blaney wore civilian clothes, as opposed to the uniform worn by the other records clerks; that once the Detective Division relocated to its former office, Blaney, unlike the other records clerks, was given her own office, which was located next to Bell's office; and that Blaney did Bell's

12

online course work during work hours at Bell's computer. None of the other records clerks wore civilian clothes or said they were offered the opportunity to wear such clothes; none had a private office; none were offered the opportunity to apply for the position of administrative assistant to Bell and Bellow; and none were allowed to come or go from work as they pleased. Batiste testified that her and the other records clerks' work loads increased because of Blaney's failure to work her hours. She claimed that all of the records clerks felt animosity towards Blaney due to her promotion. Etienne testified that the morale in the Detective Division was very low as a result of Blaney's actions. She explained that records clerks have to follow the chain of command anytime they have a complaint, which was Bellow and then Bell. Etienne stated that eventually she stopped complaining about Blaney because she knew nothing would be done; and she never complained to Bellow because of how close he was to Bell. A majority of the detectives interviewed felt that Blaney received preferential treatment from Bell.

Based on his investigation, Sgt. Richard Harrell, of LCPD's internal affairs division,[3] testified that Blaney, with Bell's approval, attended two classes at McNeese on Tuesdays and Thursdays, between 9:30 a.m. and 12:30 p.m., but had not utilized any vacation or compensatory time from January 1, 2015, to make up her missed work hours. He stated that Blaney, who Bell appointed to be his and Bellow's administrative assistant, never worked a full eight-hour day between March 5 and April 2, 2015, when he conducted surveillance of her movements; that she never arrived at work at 7:30 a.m.; she arrived at 8:30, 10:00, or 11:00 a.m. on Mondays, Wednesdays, and Fridays; she arrived between 12:30 and 1:00 p.m. on Tuesdays and Thursdays; she logged overtime on seven days that she attended

---

[3] Sgt. Harrell, at the direction of Chief Dixon, conducted criminal investigations into the actions of Blaney, Bell, and Bellow.

13

class. Sgt. Harrell determined that between November 1, 2014 and April 2, 2015, Blaney was paid for forty-five hours that she did not work and fifty-four hours of overtime that she was unqualified to receive. During his surveillance period, he stated that Blaney logged seventeen hours of overtime even though she failed to work eight-hour days. He further testified that he felt that Bell's treatment of Blaney was a trade-off for her help with his course work.

Blaney claimed that she made up all of the hours she flexed to attend class; she worked eight hours every day; and she never claimed overtime unless it was appropriate. However, she admitted that Bell had called and let her leave early, when she was making up her hours, if it was late or she was alone in the building. In the statement he submitted as part of Sgt. Harrell's criminal investigation of Blaney, Bell stated, "To my knowledge the only time I talk with Ms. Blaney about leaving or go home early [sic] is when her father was dying and I would walk up and other supervisor [sic] and man the phones to allow the clerks some personal time." However, the telephone records for Bell's cell phone, which was City property, indicated that outside of work hours (7:30 a.m. to 4:00 p.m. weekdays) between December 15, 2014 and April 17, 2015, Bell called Blaney twenty-seven times and Blaney called Bell thirteen times.

*False or Inaccurate Statements and Reports*

The record established that Bell was terminated for violating Code of Conduct Section 4.07 in regards to false or inaccurate statements or reports. That section provides, in part, that "[a]n employee shall not knowingly make, or cause or allow to be made, a false or inaccurate oral or written record or report of an official nature" including the false reporting of work records: "No employee intentionally shall falsify work records to include: regular hours worked; overtime

14

hours worked; compensatory time where hours claimed were not worked; or any applicable incentive pay not due the employee by action or definition."

In finding that the evidence failed to sustain a violation of Section 4.07, the district court focused on Chief Dixon's statement from his June 9, 2015 pre-disciplinary notice to Bell: "You directly made the flexing agreement with your administrative assistant to attend college on duty. Accordingly, allowing employees to attend college on duty is beyond the scope of your authority." After performing a *de novo* review of the record, the district court determined that Bell did not commit a violation of Section 4.07, because Blaney had been attending school during work hours since 2007.

Although Chief Dixon did accuse Bell of exceeding his authority in regards to Blaney's school attendance, his basis for termination was the fact that Bell allowed Blaney to report and receive payment for regular hours and overtime that she did not work or qualify for:

> It is determined that you Thomas Bell are in violation of policies and procedures concerning hours of work not worked by your subordinate Jeanine Blaney. In reviewing the hours of work in the observation period, the total number of work hours minus a thirty-minute meal period that Ms. Blaney should have logged according to the Daily Attendance Records, are one hundred seventy-six hours (176). The number of actual hours worked by Ms. Blaney for the same observation period is one hundred-nineteen and one-half hours (119.5). This figure results in a loss of work hours amounting to fifty-six and one-half hours (56.5). This amounts to eight hundred twelve dollars and forty-seven cents ($812.47) at an hourly rate of $14.38.

> It is determined that Jeanine Blaney received overtime compensation for seventeen (17) hours from the City of Lake Charles in the amount of three hundred eighty-one dollars and forty-eight cents ($381.48) from March 05, 2015 to present. Jeanine Blaney *was ineligible for* this due to the fact that she did not complete forty (40) hours of work in a week or eight (8.5) hours in a day required to earn overtime pay. This is further evidenced by the *non-existence* of approved personal leave forms for the days in question that aside from *sick leave*, would have counted toward her hours worked.

The tracking and verification of hours worked and not worked by Jeanine Blaney were [sic] your responsibility, DC Thomas Bell, as you directly made the "flexing" agreement with your Administrative Assistant to attend college on duty. Flex-time allows employees to schedule their regular working hours in a way that accommodates their personal preferences and family commitments. The policies of the Lake Charles Police Department and City of Lake Charles do not provide for any accommodation or allowance of "Flex-time" scheduling.

Accordingly, allowing employees to attend college on duty and the allowance of a "flex-time" schedule is beyond the scope of your authority. The allowance of an employee to be consistently absent from work in avoidance of duties due to school attendance is your responsibility, DC Thomas Bell. You allowed Jeanine Blaney to miss hours of work every morning on Tuesdays and Thursdays in order to attend college courses. You did not insure that she completed her work hours missed due to school attendance. Additionally, you allowed Jeanine Blaney to work overtime that cannot be proven to have been necessary to incur. When questioned about the appropriateness of the overtime you ordered your subordinate Arnold Bellow to approve her overtime. The overtime should not have been approved due to the fact that she had not completed her required hours in order to be eligible for overtime. In fact it has been reported that most of the work alleged to have been conducted on an overtime basis should have been completed during a normal work day.

During the hearing, Chief Dixon testified that Bell violated Section 4.07 by allowing Blaney to attend class during work hours; by allowing her to skip two to one and one-half hours of work before her 9:30 a.m. class; and by not ensuring that she made up her hours on the days she attended class. Thus, he claimed that Bell caused and allowed Blaney to falsify her work records.

Based on our review of the record, we find that the Board was presented with differing views of the evidence on the issue of whether Bell, as Blaney's supervisor, approved her daily work schedule and overtime. Although the evidence ostensibly established that Bellow, as Bell's second-in-command, was responsible for the day-to-day supervision of the Detective Division personnel, including approving the daily attendance reports and overtime requests, it further established that Bellow's authority over Blaney was usurped by Bell and that he

16

ordered Bellow to approve all actions relative to her daily work schedule and overtime. It was common knowledge in the Detective Division that Blaney answered only to Bell and that Bell was complicit in all of her actions. Accordingly, we find that it was not manifestly erroneous for the Board to find that Bell violated Section 4.07 of the Code of Conduct by causing or allowing Blaney to falsely report the hours she worked or that she was entitled to overtime when she had not worked a forty-hour week or an eight and-one-half-hour day.

*Neglect of Duty*

Next, the record established that Bell was terminated for violating Code of Conduct Section 3.17 Neglect of Duty, which provides in part:

> Each employee, because of their grade and assignment, is required to perform certain duties and assume certain responsibilities. An employee's failure to properly function in either or both of these areas constitutes a neglect of duty.
>
> The following acts or omissions to act, although not exhaustive, are considered neglect of duty:
>
> . . . .
>
> ▪ Failure of a supervisor to approve and/or confirm hours worked and/or hours of leave taken by their employees.

In finding that the record failed to establish a violation of Section 3.17 by Bell, the district court stated:

> Once again, this court finds that that would have been the responsibility of her direct supervisors, not the responsibility of the deputy chief. Perhaps he should have had better supervision of her supervisor, Mr. Bello [sic]; but the allegation is that he failed to do something that this court finds that he is not even responsible for. So, I also find that this would be without merit.

Chief Dixon testified that he determined that Bell violated Section 3.17 in the following way:

> Well, first of all, to allow her to flex her hours and allow her to go to school and not take vacation without my permission is totally outside his authority. And then, if you do get permission, then it falls

17

on you to ensure that those eight hours a days [sic] are done, either by annual leave, by using vacation day [sic], comp time or actual hours worked. That wasn't done here.

As we stated in relation to Section 4.07, the evidence established that Bellow handled the day-to-day managerial duties of the Detective Division, but it was clear that Bell specifically assumed all authority over Blaney. Accordingly, we find that the Board was presented with two views of the evidence and its finding that Bell, as Blaney's supervisor, failed to approve and/or confirm the hours she worked was not manifestly erroneous.

### Adherence to Law

The record further established that Bell was also terminated based on a violation of Section 3.01 Adherence to Law, which provides in part:

> Employees shall act in accordance with the constitutions, statutes, ordinances, and the official interpretations thereof, of the United States of America, the State of Louisiana, the Parish of Calcasieu, and the City of Lake Charles.

In finding that the record before the Board failed to establish a violation of Section 3.01, the district court stated:

> Once again, it would be the same facts that he allowed this person to somehow cheat the city to be paid or compensated for work that she did not perform or somehow to direct her to somehow cheat the system.
>
> I find the record is woefully lacking of any evidence to establish that. I also find that it is clear, and even by the chief's own admission in some of his testimony on the stand during the civil service hearing, that you have an honor system that police work under; and under that honor system there were flaws in that other people were responsible for turning in her time. And actually Deputy Chief Bell did not have direct supervision over this employee. He had supervision over her supervisor. And the system in this court's opinion is fatally flawed. Even the chief admitted during his testimony that the city had been looking into maybe implementing time clocks or some other method so that there would be more of a checks and balances. But to hold this particular person, Deputy Chief Bell, responsible for the breakdown in a system is unconscionable in this court's opinion; and it actually should be someone higher than

18

him that should be responsible for fixing the system that's clearly broken. So I find this one also without merit.

In finding that Bell violated Code of Conduct Section 3.01, Chief Dixon referenced a contract between the City and the Lake Charles Police Officers Association Local 830 (Local 830) and the City's personnel manual. Section 9.5 of the contract allowed employees of the LCPD to utilize flex time in the event of emergencies or unusual circumstances and required, if possible, seventy-two hours advance notice by the Chief of Police. The contract was executed by Mayor Randy Roach on September 20, 2007, pursuant to authority granted to him by the Lake Charles City Council by Ordinance No. 14300.

The City's personnel manual, revised July 2014,[4] provided, in part, the following under Section 3.2, pertaining to compensation:

> Unless authorized by a supervisor, employees should not work any hours that are not authorized. Do not start work early, finish work late, work during a meal break or perform any other extra or overtime work unless the employee is authorized to do so and that time is recorded on the time card. . . .
>
> It is a violation of the City's policy for any employee to falsify a time card, to alter another employee's time card, to scan in or out for another employee. It is also a serious violation of City policy for any employee or manager to instruct another employee to incorrectly or falsely report hours worked or alter another employee's time card or time scans to under- or over-report hours worked. . . .

Chief Dixon, when asked by counsel for Bell which specific law the City alleged that Bell failed to adhere to, stated, "Well, for one thing, the binding contract, assigning flex hours that my permission's not asked for nor received." When pressed on this issue, he stated, "You still have the Louisiana Revised Statute 33:2500. In the Federal law, Title 18, United States Code, Section 2, aiding

---

[4] Although Chief Dixon testified that the City's personnel manual was passed by ordinance, there is no ordinance in the record to support this claim.

19

and abetting, that's – who knows, there could be all kind of things here." "It could be several other violations I'm not aware of."

The above stated provisions contained in the contract and the personnel manual form the basis for the City's claim that Bell failed to adhere to the law; however, they are not law such that Bell's failure to adhere to them would result in a violation of Section 3.01. On September 19, 2007, the Lake Charles City Council passed Ordinance No. 14300, which authorized Mayor Roach to enter into the contract with Local 830, which was executed on September 20, 2007. "[A] mayor acting alone is without power to execute a contract binding on the city in the absence of an ordinance or resolution by the governing council authorizing him to do so." *Jackson v. McCullen*, 05-1132, p. 6 (La.App. 3 Cir. 3/8/06), 924 So.2d 1236, 1240. Thus, the effect of Ordinance No. 14300 was merely to authorize Mayor Roach to execute the contract. We find that the provisions from the City's personnel manual likewise lack standing as law. Although the record contains no evidence that the personnel manual was ratified by ordinance, other than Chief Dixon's testimony that he thought it was passed by ordinance, we note that La.R.S. 33:362(A)(3) provides that "the board of alderman shall, by ordinance, provide policies and procedures regulating the employment of municipal employees including the hiring and firing of such employees." However, we note that the stated purpose of the personnel manual is to "serve[] as a reference for employees and a working guide for supervisory and management personnel in day-to-day administration of City employee programs." Thus, we find that the provisions from the contract and the personnel manual are not law.

Although the subject provisions, by themselves, are not law, we find that they do support the City's allegation that Bell violated the provisions of La.R.S. 33:2500(A), which provides:

20

The tenure of persons who have been regularly and permanently inducted into positions of the classified service shall be during good behavior. However, the appointing authority may remove any employee from the service, or take such disciplinary actions as the circumstances warrant in the manner provided below for any one of the following reasons:

(1) Unwillingness or failure to perform the duties of his position in a satisfactory manner.

(2) The deliberate omission of any act that it was his duty to perform.

(3) The commission or omission of any act to the prejudice of the departmental service or contrary to the public interest or policy.

(4) Insubordination.

(5) Conduct of a discourteous or wantonly offensive nature toward the public, any municipal officer or employee; and, any dishonest, disgraceful, or immoral conduct.

(6) Drinking vinous or spirituous liquors while on duty or reporting for duty while under the influence of liquor.

(7) The use of intoxicating liquors, or habit forming drug, liquid, or preparation to an extent which precludes the employee from performing the duties of his position in a safe or satisfactory manner.

(8) The conviction of a felony.

(9) Falsely making a statement of any material fact in his application for admission to any test for securing eligibility or appointment to any position in the classified service, or, practicing or attempting to practice fraud or deception in any test.

(10) Using or promising to use his influence or official authority to secure any appointment to a position within the classified service as a reward or return for partisan or political services.

(11) Soliciting or receiving any money or valuable thing from any person for any political party or political purpose.

(12) Inducing or attempting to induce by threats of coercion, any person holding a position in the classified

21

service to resign his position, take a leave of absence from his duties, or waive any of his rights under the provisions of this Part, or of the rules.

(13) The development of any defect of physical condition which precludes the employee from properly performing the duties of his position, or the development of any physical condition that may endanger the health or lives of fellow employees.

(14) The willful violation of any provision of this Part or of any rule, regulation, or order hereunder.

(15) Any other act or failure to act which the board deems sufficient to show the offender to be an unsuitable or unfit person to be employed in the respective service.

In its June 22, 2015 termination letter (highlighting deleted), the City alleged that Bell violated the provisions of La.R.S. 33:2500, as follows:

Finally, the explicit utilization of a personal assistant to assist you with private matters in specific your scholastic work during normal work hours on a consistent basis is ethically wrong in light of the scope of your required duties and her duties as a records clerk. There has been a total denial and non-acceptance of responsibility by you, DC Thomas Bell of your actions concerning your personal utilization of Jeanine Blaney for your personal benefit. It is determined that you [sic] responsible for your actions and the actions of your Administrative Assistant and have displayed behavior in violation of 33§2500 as highlighted below.

Furthermore, these policy violations also constitute violations of *La. R.S. 33:2500* which provides that:
§2500. Corrective and disciplinary action for maintaining standards of service
     A.  The tenure of persons who have been regularly and permanently inducted into positions of the classified service shall be during good behavior. However, the appointing authority may remove any employee from the service, or take such disciplinary action as the circumstances warrant in the manner provided below for any one of the following reasons:

*(1) Unwillingness or failure to perform the duties of his position in a satisfactory manner.*

*(2) The deliberate omission of any act that it was his duty to perform.*

*(3) The commission or omission of any act to the prejudice of the departmental service or contrary to the public interest or policy.*

. . . .

*(14) The willful violation of any provision of this Part or of any rule, regulation, or order hereunder.*

*(15) Any other act or failure to act which the board deems sufficient to show the offender to be an unsuitable or unfit person to be employed in the respective service.*

In describing the actions taken by Bell, which violated La.R.S. 33:2500, Chief Dixon stated, "Once he gave flextime permission for Jeanine Blaney to attend school and not to come into work before her class two days a week and then not make provisions to ensure that she got her eight hours in or have the appropriate leave slip in is a violation of this." He further testified that Bell's actions impaired the efficient and orderly operation of the Detective Division:

> During some of the interviews of particularly some of the clerical employees, they talked about they were going to resign over this. They were so upset over this that they were going to resign. Chris Etienne I remember specifically saying that she was so upset over this that not only she was allowed to do what she was doing, talking about Ms. Blaney, but that it was so upsetting to her that the favoritism that she was on the verge of resigning. And that, to me, hit hard.

He added that Bell's use of Blaney to do his own coursework further impaired the efficient operations of the division because it placed a greater burden on the other records clerks to perform the work that Blaney should have been doing had she not been sitting at Bell's desk, doing his schoolwork. He stated:

> Well, after April 13th when she was put on administrative leave and the investigation continued by interviewing employees of the Investigative Division, clerical and detectives, it also came to my attention that on numerous times after she would come after school or even days she didn't go to school, she would be behind DC Bell's desk on his computer sometimes with him there, sometimes not, doing scholastic work.

> So she'd come in and skip half the day and then after she'd get there, she'd go to his office and do scholastic work with McNeese

23

textbooks or books from McNeese that was seen by several employees, clerical and detectives.

So it became accumulation [sic], a totality of the circumstances, that A, this was done without my permission; B, that he is the one that allowed it; C, he did not follow up and take responsibility to ensure that she put her hours in. And then on top of all that that she would come in and do scholastic work behind his desk that other clerical employees are watching, and detectives.

For the reasons stated in our discussions concerning Section 4.01 and Section 3.17, we find that it was not manifestly erroneous for the Board to find that Bell violated Section 3.01 by his violation of Subsections 1-3 and 14-15 of La.R.S. 33:2500(A). Bell, once he assumed the supervision of Blaney, failed, whether purposefully or not, to ensure that she worked the hours required of a classified records clerk, either by making up the hours she flexed or through the use of her accumulated leave. This resulted in a financial loss to the City in the amount of $1,193.95 ($812.47 for 56.5 hours not worked; $381.48 for 17 hours of overtime logged) during the surveillance period alone.

Bell further prejudiced the Detective Division by creating an atmosphere of jealousy and animosity amongst the records clerks, those employees responsible for maintaining the Detective Division's records. Ironically, the actions of Bell, one of highest ranking officers in the LCPD, are very similar to those which led Louisiana to adopt a constitutionally protected civil service system. La.Const. art. 10, § 1 *et seq.*

A major intent and purpose of Civil Service is to insure uniformity among employees covered thereby, to the end that such employees in a particular class will enjoy equal and uniform right[s] with others in the same class regardless of the department, agency, board or commission in which they may be employed.

*Sewerage and Water Bd. of New Orleans v. Barnett*, 225 So.2d 381, 384 (La.App. 4 Cir. 1969).

In reinstating a civil service commission's punishment of an officer, the supreme court, in *Regis v. Department of Police*, 13-1124, pp. 2-3 (La. 6/28/13), 121 So.3d 665, 665-66 (last three alterations ours), stated:

> When an officer violates the law, "it casts doubt upon the credibility of the [police department] to ably conduct one of its principal functions." *Berry v. Dep't of Pub. Safety & Corr.*, 01-2186, p. 13 (La.App. 1 Cir. 9/27/02); 835 So.2d 606, 615 (affirming discipline for a state trooper for failing to report earnings from off-duty details in violation of federal tax law); *see Thornabar v. Dep't of Police*, 08-0464, p. 4 (La.App. 4 Cir. 10/15/08); 997 So.2d 75, 78 (officer's failure to honor a court's subpoena impaired the efficiency of the NOPD as it had "the appearance of a constructive contempt of court."); *Cittadino*, 558 So.2d at 1316 (officer, by offering to sell illegal poker machines, impaired the efficient operation of the NOPD). Moreover, since the public puts its trust in the police department as a guardian of its safety, it is essential the appointing authority be allowed to establish and enforce appropriate standards of conduct for its employees sworn to uphold that trust. *See Newman* [*v. Dep't of Fire*], 425 So.2d [753,] 756 [La.1983)]. Accordingly, the Civil Service Commission's decision was not "arbitrary or capricious," and the Commission properly denied Regis's appeal.

Considering the foregoing, we find that the Board acted in good faith and for cause in upholding his termination from the LCPD. Accordingly, the judgment of the district court is reversed and the Board's decision upholding Mayor Roach and Chief Dixon's termination of Bell is reinstated.

## DISPOSITION

For the foregoing reasons, the judgment of the district court is reversed and the decision of the Lake Charles Municipal Fire and Police Civil Service Board is reinstated. Costs of this appeal are assessed to Thomas J. Bell, Sr.

**REVERSED.**